Julius G. GETMAN et al.

v.

NATIONAL LABOR RELATIONS
BOARD, Appellant.

No. 71–1097.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 15, 1971.

Decided Aug. 31, 1971.

MacKinnon, Circuit Judge, concurred
and filed opinion.

Mr. Norton J. Come, Asst. Gen. Counsel, National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Chief of Special Litigation, and Charles N. Steele, Atty., National Labor Relations Board, were on the brief, for appellant.

Messrs. Stephen B. Goldberg, Champaign, Ill., and Julius G. Getman, Bloomington, Ind., with whom Mr. Lee M. Modjeska, Washington, D. C., was on the brief, for appellees.

Mr. Marvin M. Karpatkin, New York City, for Consumers Union of United States, Inc., as amicus curiae.

Before WRIGHT, MacKINNON and ROBB, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge.

This case is before the court on appeal by the National Labor Relations Board from a judgment of the District Court ordering the Board to "provide [appellees] with names and addresses of employees eligible to vote in approximately 35 elections to be designated by [appellees], as soon as those names and addresses are in [the Board's] possession." Although the immediate controversy arises in a labor law context, the central decisional issue involves the right to and limits on disclosure of Government information under the Freedom of Information Act.[1]

I

The history of this action begins with a request by appellees on October 28, 1969 that the Board furnish them the names and home addresses of employees eligible to vote in certain representation elections. The Board now maintains lists of such names and addresses pursuant to its decision in Excelsior Underwear, Inc., 156 NLRB 1236 (1966),[2] to assure that unions have a fair chance to communicate with employees before elections and to facilitate the Board's function of resolving challenges to voter eligibility. Appellees, who are professors of labor law engaged in an NLRB voting study, seek a limited number of *Excelsior* lists in the Board's possession to facilitate scheduling of interviews with employees before and after certain elections. Appellees propose to question willing employees regarding their atti-

1. Pub.L. 89–487, 89th Cong., 2d Sess., 80 Stat. 250, 5 U.S.C. § 552 (Supp. II 1965–66), *amending* Administrative Procedure Act, ch. 324, § 3, 60 Stat. 238 (1946), 5 U.S.C. § 1002 (1964). Although Pub.L. 89–487 was repealed, its substantive provisions were enacted into the United States Code by Pub.L. 90–23, 90th Cong., 1st Sess., 81 Stat. 54 (1967), 5 U.S.C. § 552 (1970). For commentaries on the Act, *see* H.R.Rep. 1497, 89th Cong., 2d Sess. (1966) (hereinafter "H.Rep.") ; S.Rep. 813, 89th Cong., 1st Sess. (1965) (hereinafter "S.Rep.") ; Dept. of Justice,

Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act (1967) ; K. Davis, Administrative Law Treatise ch. 3A (1970 Supp.) ; Note, The 1966 Freedom of Information Act—Early Judicial Interpretations, 44 Wash.L.Rev. 641 (1969) ; Comment, The Freedom of Information Act: Access to Law, 36 Fordham L.Rev. 765 (1968).

2. Approved in NLRB v. Wyman-Gordon Co., 394 U.S. 759, 767, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

tudes toward the election process, especially about the impact of campaign tactics utilized by both employers and unions. On the basis of general statutory authority, the Board has developed an elaborate structure of rules governing the behavior of parties during a campaign. The purpose of appellees' study is to provide an empirical basis for evaluating the wisdom and utility of these regulations.

On April 22, 1970, the Board denied appellees' request for the *Excelsior* lists because, in its judgment, their proposed study would be likely to upset the "laboratory conditions"[3] required for conducting a fair representation election. Even if the proposed interviews would not actually prejudice elections, the Board feared that it would be obliged to conduct investigations and hold hearings concerning interview-related objections, and that this delay would be in disregard of the congressional policy embodied in the National Labor Relations Act that representation issues should be resolved as rapidly as possible.

On August 6, 1970, appellees filed the instant suit in the District Court alleging that they are entitled to the *Excelsior* lists under the Freedom of Information Act. The Board argued that the Freedom of Information Act does not require it to furnish the information sought by appellees because such information falls within Exemptions (4), (6) and (7) of the Act. Cross-motions for summary judgment were filed, and the District Court found on January 21, 1971 that the Board had failed to satisfy its burden of establishing that the requested information was exempted. The District Court further found that, even assuming it had power to deny disclosure on grounds other than those set out in the specific ex-

emptions of the Act, the burden of justifying nondisclosure still rested with the Board, and this burden had not been met. Accordingly, the District Court granted appellees' motion for summary judgment, and the Board brought the appeal which is now before us for consideration.[4]

For the reasons elaborated below, we agree with the District Court that the Board's refusal to disclose the information requested by appellees is not justified under any of the specific exemptions of the Freedom of Information Act. We hold further that a District Court has no equitable jurisdiction to permit withholding of information which does not fall within one of the exemptions of the Act. Accordingly, we affirm the judgment of the District Court.

## II

The primary purpose of the Freedom of Information Act is

> "to increase the citizen's access to government records. * * *
>
> " * * * The legislative plan creates a liberal disclosure requirement, limited only by specific exemptions which are to be narrowly construed. * * * "

Bristol-Myers Co. v. F.T.C., 138 U.S.App. D.C. 22, 25, 424 F.2d 935, 938 (1970).[5] (Footnotes omitted.) Subsection (a) (3) of the Act provides in pertinent part that

> "each agency, on request for identifiable records * * *, shall make the records promptly available to any person. On complaint, [a] district court of the United States * * * has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the

---

3. Sewell Manufacturing Co., 138 NLRB 66, 69–70 (1962).

4. On January 22, 1971, the Board filed a notice of appeal and asked the District Court to stay its judgment pending appeal. The District Court denied the requested stay on February 8, 1971. On February 9 the Board petitioned this

court for a stay pending appeal, which stay was granted on March 11 and dissolved on July 13.

5. *See also* 112 Cong.Rec. (Part 10) 13641 (1966) (Congressman Moss); 112 Cong. Rec. (Part 10) at 13653 (Congressman Rumsfeld); 111 Cong.Rec. (Part 3) 2797 (1965) (Senator Long of Missouri).

complain[ant]. In such a case the court shall determine the matter de novo and the burden is on the agency to sustain its action. \* \* \*"

Subsection (b) of the Act exempts from disclosure nine categories of information. The Board relies on the following three to preclude disclosure in this case:

"(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

\* \* \* \* \* \*

"(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

"(7) investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency[.]"

 Of the three exemptions relied upon by the Board, Exemptions (4) and (7) are simply inapplicable. The Board, citing the Attorney General's memorandum,[6] maintains that Exemption (4) applies to any information given the Government in confidence. But this interpretation tortures the plain meaning of Exemption (4). We agree with the court in Consumers Union of United States, Inc. v. Veterans Administration, S.D. N.Y., 301 F.Supp. 796, 802 (1969), that "this section exempts only (1) trade secrets and (2) information which is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential. The exemption given by the Congress does not apply to information which does not satisfy the three requirements stated in the statute."[7] Obviously, a bare list of names and addresses of employees which employers are required by law to give the Board, without any express promise of confidentiality, and which cannot be fairly characterized as "trade secrets" or "financial" or "commercial" information is not exempted from disclosure by Subsection (b) (4).

 Nor is the Board's refusal to disclose justified by Exemption (7), which covers "investigatory files compiled for law enforcement purposes except to the extent available by law to a [private] party." According to Senate Report No. 813 on S. 1160, 89th Cong., 1st Sess., at 9 (1965), "These are the files prepared by Government agencies to prosecute law violators.[8]. Their disclosure of such files, except to the extent they are available by law to a private party, could harm the Government's case in court." The *Excelsior* lists are not files prepared primarily or even secondarily to prosecute law violators, and even if they ever were to be used for law enforcement purposes, it is impossible to imagine how their disclosure could prejudice the Government's case in court. Even if this court had not held that spe-

---

6. *Supra* Note 1, at 32–34.

7. *See also* Grumman Aircraft Engineering Corp. v. Renegotiation Board, 138 U.S. App.D.C. 147, 151, 425 F.2d 578, 582 (1970) ; K. Davis, *supra* Note 1, § 3A.19. *But see* Barceloneta Shoe Corp. v. Compton, D.P.R., 271 F.Supp. 591 (1967). We note further that, when Congress was considering the Act, the Board took the position that "[t]he phrase 'commercial or financial' unnecessarily limits this exception." Statement of William Feldesman, NLRB Solicitor, in Hearings on S. 1160 Before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 490 (1965) (hereinafter "Senate Hearings"). The Board proposed broadening language which was not accepted. We are not free to give

Exemption (4) an expansion which Congress considered and denied.

8. *See also* H.Rep. at 11, which is characteristically broader and goes beyond the express terms of the statute. In such instances, we agree with the two District Courts which have considered the issue that the Senate report is to be preferred over the House report as a reliable indication of legislative intent because the House report was not published until after the Senate had already passed its bill. Benson v. General Services Administration, W.D.Wash., 289 F.Supp. 590, 595 (1968), affirmed on other grounds, 9 Cir., 415 F.2d 878 (1969) ; Consumers Union of United States, Inc. v. Veterans Administration, S.D.N.Y., 301 F.Supp. 796, 801 (1969), appeal dismissed as moot, 2 Cir., 436 F.2d 1363 (1971) ; K. Davis, *supra* Note 1, §§ 3A.2 & 3A.23.

cific exemptions from disclosure in the Act are to be narrowly construed,[9] on a simple reading of the plain language of Subsection (b) (7) we would be constrained to hold that it provides appellant with no justification for its withholding of the *Excelsior* lists sought by appellees.

■ Although Exemption (6) differs from Exemptions (4) and (7) in that it covers information similar in some respects to the kind being sought in this case, we agree with the District Court that the Board has not met the burden of proof required to justify a refusal to disclose under this part of the Act. Exemption (6) applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Assuming that the *Excelsior* lists may be characterized as "personnel and medical files and similar files," it is still only a disclosure constituting a "clearly unwarranted invasion of personal privacy" that falls within the scope of Exemption (6). Exemption (6) requires a court reviewing the matter *de novo* to balance the right of privacy of affected individuals against the right of the public to be informed[10]; and the statutory language "clearly unwarranted" instructs the court to tilt the balance in favor of disclosure.[11]

■ In carrying out the balancing of interests required by Exemption (6), our first inquiry is whether disclosure of the names and addresses of employees constitutes an invasion of privacy and, if so, how serious an invasion. We find that, although a limited number of employees will suffer an invasion of privacy in losing their anonymity and in being asked over the telephone if they

9. Bristol-Myers Co. v. F.T.C., 138 U.S. App.D.C. 22, 424 F.2d 935 (1970).

10. Any discretionary balancing of competing interests will necessarily be inconsistent with the purpose of the Act to give agencies, and courts as well, definitive guidelines in setting information policies. *See* text at page 679 *infra*. But Exemption (6), by its explicit language, calls for such balancing and must therefore be viewed as an exception to the general thrust of the Act. S.Rep., at 9, explains:

"The phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information. The application of this policy should lend itself particularly to those Government agencies where persons are required to submit vast amounts of personal data usually for limited purposes. * * *"

We note in passing that no other exemption specifically requires balancing. In view of the Act's basic purpose to limit discretion and encourage disclosure, we believe that Exemption (6) should be treated as unique, and that equitable discretion should not be imported into any of the other exemptions. *But see* General Services Administration v. Benson, *supra* Note 8, 415 F.2d at 880, *and* American Mail Line, Ltd. v. Gulick, 133 U.S.App.D.C. 382, 389 & n. 15, 411 F. 2d 696, 703 & n. 15 (1969).

11. S.Rep. at 9; H.Rep. at 1. The legislative history suggests that use of the "clearly unwarranted" standard is the expression of a carefully considered congressional policy favoring disclosure. At the hearings on the bill various agency spokesmen urged deletion of either the word "clearly" or the entire "clearly unwarranted" phrase so that nondisclosure would have been permitted whenever disclosure would result in any invasion of privacy. *See, e. g.,* testimony of Edwin Rains, Assistant General Counsel, Treasury Department, Senate Hearings at 36; testimony of Fred B. Smith, Acting General Counsel, Treasury Department, Hearings Before a Subcommittee of the Committee on Government Operations of the House of Representatives on H.R. 5012, 89th Cong., 1st Sess., 56 (1965) (hereinafter "House Hearings"); testimony of Clark R. Molenhoff, Vice Chairman, Sigma Delta Chi Committee for Advancement of Freedom of Information, House Hearings at 151; testimony of William Feldesman, NLRB Solicitor, Senate Hearings at 491 & House Hearings at 257. Congress, however, refused to delete language it considered critical in limiting the scope of the exemption. *See* S.Rep. at 9; H.Rep. at 11.

would be willing to be interviewed [12] in connection with the voting study, the loss of privacy resulting from this particular disclosure should be characterized as relatively minor. Both the House and Senate reports on the bill which became the Freedom of Information Act indicate that the real thrust of Exemption (6) is to guard against unnecessary disclosure of files of such agencies as the Veterans Administration or the Welfare Department or Selective Service or Bureau of Prisons, which would contain "intimate details" [13] of a "highly personal" [14] nature. The giving of names and addresses is a very much lower degree of disclosure; in themselves a bare name and address give no information about an individual which is embarrassing. In the conduct of appellees' study, any disclosure of information more personal than a name and address is wholly consensual and within the control of the employee. Appellees represent that any employee who does not wish to undergo an interview may refuse, and that employees have in fact done so in connection with the pilot studies conducted to date. Although four pilot studies had been conducted at the time briefs were submitted, there is no indication whatever in the record of any harassment of employees who declined to cooperate. Thus assuming *arguendo* that the disclosure of *Excelsior* lists constitutes disclosure of a "file" within the meaning of Exemption (6), and while recognizing that such disclosure does involve some invasion of privacy, we find that the invasion itself is to a very minimal degree.

In determining whether this relatively minor invasion of privacy is "clearly unwarranted," we must also weigh the public interest purpose of appellees'

NLRB voting study, the quality of the study itself, and the possibility that appellees could pursue their study without the *Excelsior* lists. As previously indicated, the Board has established complicated rules and enforcement procedures governing the behavior of the parties during election campaigns. The costs of Board regulation are great. The proportion of elections in which the losing party has filed objections has risen to almost one in seven in recent years,[15] and such objections require expensive and time consuming investigation, hearings and rulings. Interference with the "laboratory conditions" required to conduct these elections may indeed result in elections being set aside, as the Board contends. But there is no proof to support the contention. It will be time enough to consider the relief to which the Board is entitled if and when a showing of disruption of Board functions is made.

We agree with appellees that it is ironic that the Board should attempt to use speculation about added delays in the prompt resolution of questions of representation as a basis for preventing this study. One of the primary goals of the study is to consider the feasibility of changing Board rules to eliminate unnecessary grounds for challenges to elections, so as to streamline the entire process. Thus the Board is taking a too shortsighted view of its own self interest. Moreover, the Board's position suffers from the obvious self-justifying tendency of an institution which in over 30 years has itself never engaged in the kind of much needed systematic empirical effort to determine the dynamics of an election campaign or the type of conduct which actually has a coercive impact.[16] The public interest need for such

---

12. Before attempting to interview a particular employee, appellees first telephone to describe the study and ask if the employee is willing to be interviewed.

13. H.Rep. at 11.

14. S.Rep. at 9.

15. Samoff, NLRB Elections: Certainty and Uncertainty, 117 U.Pa.L.Rev. 228, 253 (1968).

16. For example, in the 33rd Annual Report of the National Labor Relations Board at 60 (1969) it is stated:

"* * * In evaluating the interference resulting from specific conduct,

an empirical investigation into the assumptions underlying the Board's regulation of campaign tactics has for some time been recognized by labor law scholars.[17] This particular study has been reviewed and supported by virtually every major scholar in the labor law field.[18] The record is also replete with testimonials from leading management and union representatives and Government officials.[19] Appellees' research has also been approved by the prestigious National Science Foundation, which has awarded appellees the largest grant ever made available for law related research.[20]

Without reviewing the practical workings of the NLRB voting study in detail here, the court notes that appellees Getman and Goldberg are both highly qualified specialists in labor law,[21] that they have designed their study carefully and in collaboration with scholars in the field of survey research over the past two years, and that they have selected and trained their interviewers carefully to avoid biasing effects in the questioning process. The interview part of the study has been tested in three pilot elections and evaluation reveals no evidence which would support the Board's fears that the interviewing might have the effect of confusing or inhibiting the employees. According to the uncontested statement of appellees, no employee who has consented to an initial interview has yet declined to schedule a second interview or to vote in the subsequent election. No employee has brought a complaint concerning the study to either appellees or the Board. Followup checks have shown that employees have been answering truthfully such "sensitive" questions as whether they signed a union authorization card and how they voted.

In striking the balance necessary to determine whether disclosure of the *Excelsior* lists would constitute a clearly unwarranted invasion of privacy, it is also significant that appellees are asking for the names and addresses of employees in only 35 out of the approximately 15,000 elections which the Board will supervise during the next two years [22] and that appellees have no other source for obtaining the names and ad-

---

the Board does not attempt to assess its actual effect on the employees, but rather concerns itself with whether it is reasonable to conclude that the conduct tended to prevent the free formation and expression of the employees' choice. * * * "

See also Murray Envelope Corp. of Mississippi, 130 NLRB 1574, 1576 (1961); Lane Drug Stores, Inc., 88 NLRB 584, 585 n. 5 (1950); Marshall Field & Co., 34 NLRB 1, 10 (1941).

17. Bernstein, The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act, 79 Yale L.J. 571, 582 (1970); *see also* Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 46–53, 88–90 (1964); Samoff, *supra* Note 13; Note, Behavioral and Non-Behavioral Approaches to NLRB Representation Cases, 45 Indiana L.J. 276 (1970).

18. *See, e. g.,* Joint Appendix 24, Exhibit 8; JA 25, Ex. 9; JA 26, Ex. 10; JA 15, Ex. 1.

19. *See, e. g.,* JA 31, Ex. 15; JA 34, Ex. 16; JA 35, Ex. 17; JA 28, Ex. 12; JA 29, Ex. 13; JA 30, Ex. 14; JA 19, Ex. 4; JA 15, Ex. 1.

20. JA 18, Ex. 3.

21. Professor Getman has taught labor law for eight years and has written several articles concerning the National Labor Relations Act. *See* The Midwest Piping Doctrine: An Example of the Need for Reappraisal of Labor Board Dogma, 31 U.Chi.L.Rev. 292 (1964); Section 8(a) (3) of the NLRA and the Effort to Insulate Employee Free Choice, 32 U.Chi.L.Rev. 735 (1965); The Protection of Economic Pressure by Section 7 of the NLRA, 115 U.Pa.L.Rev. 1195 (1967). Professor Goldberg has taught labor law for six years. His writings include District Court Review of NLRB Representation Elections, 42 Indiana L.J. 455 (1967); The Labor Law Obligations of a Successor Employer, 63 Nw.U.L.Rev. 735 (1969); Coordinated Bargaining Tactics of Unions, 54 Cornell L.Rev. 897 (1969). Both appellees were previously employed as attorneys by the NLRB.

22. *See* 33rd Annual Report of the National Labor Relations Board, *supra* Note 16, at 1.

dresses consistent with their goal of an unbiased and successful study. In each of the pilot studies to date, appellees have obtained a list of employees from the union. But this procedure suffers from the difficulty in persuading the union to give up such lists, which problem has lately been exacerbated because of union fear that the employer involved will emphasize union cooperation with appellees as a tactic in its own campaign. In addition, the Board has asserted that if it is successful in this litigation it might seek to enjoin appellees from carrying out their study, even where the information is obtained from union or management, for the same reason advanced here: that the study will conflict with its responsibility to expedite representation elections under Section 9 of the National Labor Relations Act.[23]

Having considered and weighed all of the above factors, we find it impossible to say that disclosure of the *Excelsior* lists would constitute a clearly unwarranted invasion of employee privacy under Exemption (6) of the Freedom of Information Act.[24] If anything, our finding is that disclosure for purposes of appellees' study is clearly warranted. The invasion of employee privacy strikes us as very minimal, and the possible detrimental effects of the study in terms of delaying the election process as highly speculative. On the other hand, the study holds out an unusual promise. As the National Science Foundation con-cluded in its Proposal Review Summary and Program Recommendations:

"The investigators are among the ablest young labor law professors in the country and both have had considerable practical experience in the work of the National Labor Relations Board. In affiliation with a sophisticated social science survey research organization, they have developed a distinctive effort to test the behavioral basis on which an important body of labor law is founded. A successful project here would serve as a much-needed model to encourage further empirical work to test the behavioral assumptions underlying important laws."

JA 164, Ex. 44.

### III

█ Having found that nondisclosure of the *Excelsior* lists is not warranted under Exemption (4), (6) or (7), we must still resolve the question whether the courts have equitable discretion to permit withholding of information which does not fall within one of the specific exemptions to the Act. The District Court in this case held that, "[a]ssuming that [a District Court], in an action under the Freedom of Information Act, may deny disclosure on grounds other than those set out in the specific exemptions to the Act, the burden of justifying non-disclosure must still rest upon the agency. I find that the Board has

23. 29 U.S.C. § 159 (1964).

24. This decision, of course, goes only to the merits of appellees' request for disclosure. Although one of the purposes of the 1967 Freedom of Information Act was to limit agency discretion not to disclose by abandoning the former ground rule that a person requesting information show he was "properly and directly concerned," and by instead warranting disclosure to "any person," we find that this purpose is in unavoidable conflict with the explicit balancing requirement of Exemption (6). *See* Note 10 *supra.* Since Exemption (6) necessarily requires the court to balance a public interest purpose for disclosure of personal information against the potential invasion of individual privacy, a court's decision to grant disclosure under Exemption (6) carries with it an implicit limitation that the information, once disclosed, be used only by the requesting party and for the public interest purpose upon which the balancing was based. By the same token, our ruling for appellees in this case should not be understood automatically to compel the Board in the future to give out *Excelsior* lists to all other applicants, and for other elections. A request by less well qualified applicants, or applicants with a less carefully designed or more disruptive study would require a new balancing and might be found to involve a "clearly unwarranted invasion of personal privacy" which would justify nondisclosure.

not met that burden." We do not need to reach the balancing issue decided by the District Court because we agree with the dicta of the panel in Soucie v. David, —— U.S.App.D.C. ——, 448 F.2d 1067 (decided April 13, 1971), and with the Fourth Circuit's decision in Wellford v. Hardin, 444 F.2d 21 (1971), that a District Court has no equitable jurisdiction to deny disclosure on grounds other than those laid out under one of the Act's enumerated exemptions.[25]

In order to appreciate the significance of the relevant language of 5 U.S.C. § 552, one should remember that, prior to the enactment of the Freedom of Information Act in 1966, Section 3 of the Administrative Procedure Act allowed the Government to withhold information "in the public interest" or "for good cause found" and to require the person requesting information to show that he was "properly and directly concerned."[26] Under the old APA, Section 3, agency and department heads enjoyed a "sort of

25. Consumers Union of United States, Inc. v. Veterans Administration, *supra* Note 8, holds that, even where information is not specifically exempted under the Act, the court must still apply "traditional equitable principles." However, counsel for Consumers Union as *amicus curiae* in the instant case was counsel for plaintiff in *Consumers Union* and has brought to our attention the fact that the equitable discretion issue was neither briefed nor argued by either party before the District Court. An unusual set of developments then precluded the District Court's opinion from receiving substantive review on appeal. The scenario was briefly as follows: Consumers Union sought to obtain information the Veterans Administration had compiled in its program to test hearing aids for distribution to veterans. The District Court ordered the VA to disclose the test data, but denied Consumers Union's request for an injunction ordering the VA to disclose comparative scores and the scoring scheme itself, on the theory that such information might confuse and mislead the public and that, even where the Freedom of Information Act permitted disclosure, the District Court possessed discretion to deny remedies where the release of information would result in harm to the public interest. Consumers Union appealed on this point, and the VA cross-appealed on the ground that nondisclosure was protected under some of the specific exemptions of the Act. Subsequent to the decision of the District Court but before oral argument on appeal, the VA made a policy decision to disclose all three types of information originally sought by Consumers Union and actually disseminated this information. The policy was made retroactive to cover contract year 1968, the year for which Consumers Union had solicited information, and Consumers Union was provided with the information it sought in the District Court. The Government then moved to dismiss

the appeal as moot. The appellate court denied this motion because the Government's position on cross-appeal suggested that it felt the disclosure was discretionary on its part and not required by the Freedom of Information Act, creating the distinct possibility that the dispute that generated the present action would recur. However, at oral argument the Government dropped its cross-claim and conceded that the results of the tests on hearing aids did not come within any of the exemptions to the Act and that no public interest rationale justified withholding of the information. Under these circumstances, it being quite clear that the Government would not again assert that hearing aid tests are outside the Act or should be concealed in the public interest, the appeal was dismissed as moot. 436 F.2d 1363.

The Board maintains at page 16 of its brief, citing General Services Administration v. Benson, *supra* Note 8, 415 F.2d at 880, that the Ninth Circuit has also held that equitable discretion lies to deny disclosure even though none of the exemptions of the Act are applicable. Despite some ambiguous dicta, however, a reading of *Benson* shows that the court made only the much more limited holding that, in determining whether the fifth exemption under the Act is applicable, the court must weigh the effect on the public interest in accordance with traditional equity principles. *See*, e. g., American Mail Line, Ltd. v. Gulick, *supra* Note 10, 133 U.S.App.D.C. at 389 & n. 15, 411 F.2d at 703 & n. 15. In fact, Epstein v. Resor, 9 Cir., 421 F.2d 930, 932–933, cert. denied, 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549 (1970), suggests that the Ninth Circuit would agree with this court's and the Fourth Circuit's interpretation of the Act.

26. 5 U.S.C. § 1002 (1964), Revised Statutes and Statutes at Large, June 11, 1946, ch. 324, § 3, 60 Stat. 238.

personal ownership of news about their units," [27] and a wide ranging discretion to suppress information, which was fiercely objected to by the press and other concerned individuals.[28] As a result of this criticism, Congress amended the APA in 1966. The basic purpose of the amendment, which has become popularly known as the Freedom of Information Act, was to guarantee public access to Government information by converting a "withholding" statute to a "disclosure" statute [29] and by mandating full public access to Government information, subject to a limited number of clearly drawn exemptions.[30]

The question whether the courts retain equitable discretion under the Act is settled for us by the express language of the Act, aided by the gloss from the Senate report. Section 552(c) states:

"This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. * * *" [31]

The Senate report states:

"The purpose of [§ 552(c)] is to make it clear beyond doubt that all *materials* of the Government are to be made available to the public by publication or otherwise unless explicitly allowed to be kept secret by one of the exemptions in [§ 552(b)]. * * *"

S.Rep. at 10. (Emphasis in original.) The Senate report also sets out that:

"It is the purpose of the present bill to eliminate such phrases [as 'requiring secrecy in the public interest,' or 'required for good cause to be held confidential'], to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language and to provide a court procedure by which citizens and the press may obtain information wrongfully withheld. It is important and necessary that the present void be filled. It is essential that agency personnel, *and the courts as well,* be given definitive guidelines in setting information policies. * * *"

---

27. H.Rep. at 2.

28. *See, e. g.,* Hearings Before the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee on S. 1666 and S. 1663, 88th Cong., 1st Sess., 7, 16, 35, 60, 82, 95, 140, 237, 27 & 109 (1963).

29. S.Rep. at 5.

30. S.Rep. at 3.

31. As a noted administrative law scholar has observed, "The pull of the word 'specifically' is toward emphasis on statutory language and away from all else—away from implied meanings, away from reliance on legislative history, away from needed judicial legislation." K. Davis, *supra* Note 1, § 3A.15. Finding the statute to be badly drafted and in some instances ill conceived, Professor Davis suggests that the courts might act to redraft the statute by invoking the doctrine of equitable discretion. *See, e. g.,* §§ 3A.1, 3A.16 & 3A.19. We decline this course. If the courts begin to invoke their equitable powers to permit nondis-

closure running beyond the enumerated exemptions of § 552(b), the overriding purpose of the Act—which is to require disclosure in all but a narrowly and clearly defined category of situations—would be seriously undermined.

32. The House report differs from the Senate report in that it suggests that District Courts may have equitable discretion. *E. g.,* "[t]he Court will have authority whenever it considers such action equitable and appropriate to enjoin the agency from withholding its records and to order the production of agency records improperly held." H.Rep. at 9. And "[t]he purpose of this subsection is to make clear beyond doubt that all the materials of Government are to be available to the public unless specifically exempt from disclosure by the provisions of subsection (e) [§ 552(b)] *or limitations spelled out in earlier subsections." Id.* at 11. (Emphasis added.) For the reasons set out in Note 8 *supra,* however, we consider the Senate report the more reliable indicator of legislative intent.

*Id.* at 3.[32] (Emphasis added.) We agree with the *Soucie* panel that:

" * * * Congress clearly has the power to eliminate ordinary discretionary barriers to injunctive relief, and we believe that Congress intended to do so here.

" * * * Through the general disclosure requirement and specific exemptions, the Act thus strikes a balance among factors which would ordinarily be deemed relevant to the exercise of equitable discretion, *i. e.*, the public interest in freedom of information and countervailing public and private interests in secrecy. Since judicial use of traditional equitable principles to prevent disclosure would upset this legislative resolution of conflicting interests, we are persuaded that Congress did not intend to confer on district courts a general power to deny relief on equitable grounds apart from exemptions in the Act itself. * * * "

—— U.S.App.D.C. at ——, 448 F.2d at 1067.

To sum up, the names and addresses of employees are information within the scope of the Freedom of Information Act, which was designed in part to "provide the means by which the people of this country can become informed and thus be able to scrutinize the activities and operation of their Government." [33] While the Board is correct that the *Excelsior* lists are but the first step in the total information gathering process in which appellees are engaged and that the lists themselves do not in any direct sense reveal anything about the Board's operations, there is no language or principle embodied in the Act which requires that information sought under its authority be sufficient, in and of itself, to evaluate the agency's performance. The *Excelsior* lists failing to fall within any of the Act's enumerated exceptions, and there being no equitable discretion in a District Court to create new exemptions, appellees are entitled to disclosure.

Affirmed.

MacKINNON, Circuit Judge (concurring):

The extremely broad sweep of the Freedom of Information Act, with its narrow exemptions, makes it mandatory in my opinion—if we are to follow the directions of Congress—to direct the National Labor Relations Board to furnish appellees with the names and addresses of employees as requested. However, I agree with the Board that this request could lead to undesirable interference in elections. Furnishing these lists for use by third parties *during* the representation election may interject a third factor which really has no place in the election. I cannot say, however, that the release of the lists "would constitute a *clearly unwarranted* invasion of privacy." Whether appellees' interference in these elections will be misunderstood and mis-

---

33. Remarks of Senator Dirksen, 110 Cong. Rec. (Part 13) 17088 (1964). Although the primary purpose of the Act may be to help the citizen to know "how his Government is operating," H.Rep. at 6, we note in passing the Act is not limited to disclosures involving public scrutiny of governmental operations. In Consumers Union of United States, Inc. v. Veterans Administration, *supra* Note 8, the publisher of Consumer Reports obtained certain records of a VA hearing aid testing program for a purpose which had nothing whatever to do with revealing Government operations—it merely wished to advise its readers which hearing aids were best. Similarly, in General Services Administration v. Benson, *supra* Note 8, the plaintiff, who obtained Government records concerning the value of certain property it had sold him, needed those records for the purely personal purpose of substantiating his position in a dispute with the Internal Revenue Service as to the tax consequences of that sale.

interpreted and will cause adverse reactions is unpredictable at this stage.

My principal concern is for the future. We are here following the dictates of Congress and are making information available for a use that may interfere with the proper functioning of government. This use may have its beneficial effects also, but before the good is harvested considerable turmoil and disruption may result. And this decision is only the beginning. We may expect similar wholesale demands for lists of names and addresses from other persons, not for what they may disclose about the functioning of government, but for their collateral ability to aid the person requesting such information.

While it must be recognized that the Board might return the lists to the employers and in the future might alter its *Excelsior* rule so that employers would deliver the names and addresses to the unions directly rather than filing them with the regional directors,[1] and thus obviate the requirement to disclose, the annoyance to individuals and the Government that could result from requiring the Government to furnish various lists of names and addresses to various persons on request could be very substantial.

It seems to me that furnishing bare lists of names and addresses of various groups of persons in various Government files is not the sort of disclosure that Congress basically had in mind in enacting the Freedom of Information Act. But in my opinion, the Act as it presently exists practically requires the disclosure of such lists on demand. One need not elaborate on the various abuses that could result if lists of people as classified by the Government for particular purposes became available practically on demand in wholesale lots. If this situation is to be corrected, it will require an amendment to the Act.

---

1. Excelsior Underwear Corp., 156 N.L.R.B. 1236, 1239 (1966).