AMERICAN AIRLINES, INC., Appellee,

v.

NATIONAL MEDIATION BOARD, George S. Ives, Individually and as Chairman of the National Mediation Board, Robert O. Harris and David H. Stowe, Individually and as members of the National Mediation Board, and Rowland K. Quinn, Jr., Individually and as Executive Secretary of the National Mediation Board, Appellants,

and

International Brotherhood of Teamsters, Airline Division, Intervenor-Appellant.

Nos. 272, 381, Dockets 78–6121, 78–6162.

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1978.

Decided Dec. 4, 1978.

---

Michael H. Dolinger, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Patrick H. Barth, Asst. U. S. Atty., New York City, of counsel), for appellant National Mediation Bd.

Roland P. Wilder, Jr., Washington, D. C. (Robert M. Baptiste and Mimi C. Satter, Washington, D. C., and Richard L. Hartz, Cohen, Weiss & Simon, New York City, of counsel), for intervenor-appellant International Brotherhood of Teamsters.

Peyton H. Moss, Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for appellee.

Andrew E. Zelman, Roger H. Briton, Surrey, Karasik, Morse & Seham, New York City, Wyatt Johnson, Chicago, Ill., for Airline Employees Ass'n, International as amicus curiae.

Before OAKES, GURFEIN and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

This appeal, argued to us with considerable sophistication, presents the fairly simple question whether under the Freedom of Information Act (FOIA), 5 U.S.C. § 552[1] the National Mediation Board (the Board) must disclose the number of cards that a union seeking to organize an air carrier's

---

1. For a general treatment of the FOIA, see K. Davis, *Administrative Law of the Seventies* ch. 3A (1976); K. Davis, 1 *Administrative Law Treatise* ch. 5 (2d ed. 1978); K. Davis, *Administrative Law Treatise* ch. 3A (1970 Supp.); Note, *The Freedom of Information Act: A Seven-Year Assessment*, 74 Colum.L.Rev. 895 (1974).

employees submits to the Board. The answer to the question is complicated somewhat by the tortured, not to say obfuscating, legislative history of the FOIA so incisively remarked upon by Kenneth Culp Davis.[2] But finding our way through the maze of the legislative history is not as difficult as first appears. We do find the information sought exempt as "commercial . . . information obtained from any person and privileged or confidential" under the fourth exemption to the Act, 5 U.S.C. § 552(b)(4).[3] Accordingly we reverse the judgment of the United States District Court for the Southern District of New York, Kevin T. Duffy, Judge, 453 F.Supp. 430 (S.D.N.Y.1978), which would have required such disclosure.

The Railway Labor Act, 45 U.S.C. § 151 et seq., which since 1936 has covered air carriers, 45 U.S.C. § 181, was enacted, among other reasons, as was its analogue the National Labor Relations Act, to prevent "any limitation upon freedom of association among employees" and to ensure "the prompt and orderly settlement" of labor-management disputes. 45 U.S.C. § 151a.[4] Each party has the right to designate its bargaining representative "without interference, influence, or coercion by [the other] party," 45 U.S.C. § 152, Third.[5] Under *International Association of Machinists v. Street*, 367 U.S. 740, 759, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), construing 45 U.S.C. § 152, Fourth,[6] it is unlawful for carriers to interfere with an organization of employees or to influence or coerce them in an effort to induce them to join or not to join a labor organization or otherwise to interfere with employees' rights. These prohibitions are similar to those found in the somewhat better-known National Labor Relations Act.[7]

The Board has two principal duties. First, upon request, it determines and certifies the bargaining representative of any class or craft of air or rail employees, 45 U.S.C. § 152, Ninth.[8] It has adopted regu-

2. *See*, as to Exemption 4, 5 U.S.C. § 552(b)(4), K. Davis, *Administrative Law Treatise* § 3A.19 (1970 Supp.).

3. 5 U.S.C. § 552(b)(4) provides: "This section [requiring disclosure] does not apply to matters that are—. . . trade secrets and commercial or financial information obtained from a person and privileged or confidential."

4. 45 U.S.C. § 151a provides in pertinent part:
The purposes of this chapter are: . . . (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; . . . (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

5. 45 U.S.C. § 152, Third, provides in pertinent part:
Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives.

6. 45 U.S.C. § 152, Fourth, provides in pertinent part:
No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .

7. *See* §§ 7–8 of the National Labor Relations Act, 29 U.S.C. §§ 157–58.

8. 45 U.S.C. § 152, Ninth, provides in pertinent part:
If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been des-

lations set out in full in the margin [9] describing the procedure by which a party seeking certification as the bargaining representative for a "class or craft" of employees may apply to the Board for an investigation to determine the representation wishes of the employees in the particular class or craft. 45 U.S.C. § 152, Ninth; 29 C.F.R. § 1203.2. Under the regulations the application must show specifically the name or description of the craft or class involved, the estimated number of employees in such craft or class, and the number of signed authorizations submitted from employees in each craft or class. *Id.*, note 9 *supra*. Then, *after* the Board has made its investigation and determined the precise scope of the craft or class involved and whether there has been a "showing of proved authorizations from at least thirty-five percent of the employees in the craft or class," 29 C.F.R. § 1206.2(b),[10] the Board will authorize an election or determination proceeding. The thirty-five percent minimum requirement is not imposed upon the Board by statute; rather the Board has adopted it as a regulation presumably to avoid frivolous elections and determination proceedings. It is also significant to note that

under 29 C.F.R. § 1208.4(b), the Board regulations require it to "treat as confidential the evidence submitted in connection with a representation dispute and the investigatory file pertaining to the representation function." Once the Board certifies a union based on a majority of the votes in an election or as above provided, the parties are obligated to negotiate in good faith on labor-management issues under judicial construction of 45 U.S.C. § 152, Second. *See, e. g., Pyzynski v. New York Central Railway*, 421 F.2d 854 (2d Cir. 1970). It is only then that the Board's second principal function of providing mediation services to assist in settlement of labor-management disputes, 45 U.S.C. §§ 155, 183, comes into play.

Intervenor-defendant-appellant here, International Brotherhood of Teamsters, Airline Division (IBT), filed an application (sometimes called a petition) for investigation of representation on September 9, 1977. The union sought a determination under the statute and regulations of the representation wishes of passenger service employees of American Airlines (American). A week after the filing the Board, pursuant to

**9.** 29 C.F.R. § 1203.2 provides:

Applications for the services of the National Mediation Board under section 2, Ninth, of the Railway Labor Act to investigate representation disputes among carriers' employees may be made on printed forms N.M.B. 3, copies of which may be secured from the Board's Secretary. Such applications and all correspondence connected therewith should be filed in duplicate and the applications should be accompanied by signed authorization cards from employees composing the craft or class involved in the dispute. The applications should show specifically the name or description of the craft or class of employees involved, the name of the invoking organization, the name of the organization currently representing the employees, if any, the estimated number of employees in each craft or class involved, and the number of signed authorizations submitted from employees in each craft or class. The applications should be signed by the chief executive of the invoking organization, or other authorized officer of the organization. These dis-

ignated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.

putes are given docket numbers in series "R".

**10.** 29 C.F.R. § 1206.2 provides:

(a) Where the employees involved in a representation dispute are represented by an individual or labor organization, either local or national in scope and are covered by a valid existing contract between such representative and the carrier a showing of proved authorizations (checked and verified as to date, signature, and employment status) from at least a majority of the craft or class must be made before the National Mediation Board will authorize an election or otherwise determine the representation desires of the employees under the provisions of section 2, Ninth, of the Railway Labor Act.

(b) Where the employees involved in a representation dispute are unrepresented, a showing of proved authorizations from at least thirty-five (35) percent of the employees in the craft or class must be made before the National Mediation Board will authorize an election or otherwise determine the representation desires of the employees under the provisions of section 2, Ninth, of the Railway Labor Act.

its powers under 45 U.S.C. § 152, Ninth,[11] requested from American the number of its passenger service employees and whether they were already represented by a bargaining representative. In reply American provided the information as required but also demanded from the Board under the FOIA the number of authorization cards filed, the dates of such filings, the number of cards filed on each such date, the form or forms of the cards used, and the number of cards filed in each such form. Ultimately the Board did provide American with the date of filing of the cards and the forms of cards but on the basis of Exemptions 4 and 7(A) to the FOIA declined to provide the number of cards either in toto or by form of card.[12] Because we hold that the forms were exempt under Exemption 4, we omit reference to Exemption 7(A), relating to investigatory records compiled for law enforcement purposes, as to which see our own *Title Guarantee Co. v. NLRB*, 534 F.2d 484 (2d Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976), and the more recent *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) (statements of employees in labor dispute under NLRA held to be exempt as gathered in the course of the Board's investigatory function).

As action on the IBT petition proceeded, American contested the IBT's definition of the appropriate class or craft and requested a hearing on the issue. The hearing commenced in November, 1977, and concluded in March, 1978; although the parties had filed post-hearing briefs at the time this case was argued, the hearing officer had not as yet made any recommendation. Until the examiner makes his recommendation as to the appropriate class or craft and the Board acts upon the recommendation, the application is still "pending," no election will be held, and, obviously, it would be impossible to determine whether the IBT had satisfied the Board's thirty-five percent

requirement. Thus, for purposes of this appeal, it is not known whether the Board will order an election in accordance with the regulation above. Nevertheless, American commenced suit to compel the Board to disclose the information denied, and after the filing of appropriate cross-affidavits the district court granted American's motion for summary judgment, holding that the information did not "constitute commercial information in its ordinary sense" within the meaning of Exemption 4 and that the representation investigation was not a "law enforcement" proceeding under Exemption 7.

The affidavits filed by the Board and the union allege that disclosure during an organizing campaign of the number of authorization cards would disadvantage the union in a number of respects, *e. g.*, by giving the employer an incentive to attempt to affect the timing of an election; by enabling the employer to convey the impression that unionization is a lost cause, that the employees should not make the effort, or that impending defeat would entail adverse consequences; or by assisting carrier resistance through the use of small selective layoffs or hirings. The affidavits also refer to raiding by other unions and damage to the union's credibility. American's affidavits disputed these propositions, but in the posture of the case we must accept them as true even though we might take them somewhat with a grain of salt.

As Professor Davis notes, *supra* note 2, the legislative history of Exemption 4 is confusing, if not misleading. Nevertheless, the case law has essentially followed the lead of the late Judge Thomas Croake of the Southern District of New York in *Consumers Union of United States, Inc. v. Veterans Administration*, 301 F.Supp. 796 (S.D. N.Y.1969), *appeal dismissed as moot*, 436 F.2d 1363 (2d Cir. 1971), which rejected the argument that noncommercial or nonfinan-

---

11. 45 U.S.C. § 152, Ninth, provides in pertinent part:

The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph.

12. Evidently different forms of cards were used in different regions.

cial information may be exempt if it is simply privileged or confidential and held that "[t]he plain language of this section exempts only (1) trade secrets and (2) information which is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *Id.* at 802. As Judge Croake said, the exemption given by Congress does not apply to information [other than trade secrets] which does not satisfy the three requirements stated in the statute. *Id.* Judge Croake's construction was adopted in *Getman v. NLRB,* 450 F.2d 670, 673, 146 U.S.App.D.C. 209, 212 (1971) (list of names and addresses of employees which employers are required by law to give to the National Labor Relations Board not exempt where there was no express promise of confidentiality); and *Getman,* in turn, has been followed in *National Parks & Conservation Association v. Morton,* 162 U.S.App.D.C. 223, 224, 498 F.2d 765, 766 (1974) (information about national park concessions operated is "financial" but exempt only if also confidential); *Washington Research Project, Inc. v. HEW,* 164 U.S.App.D.C. 169, 176–177, 504 F.2d 238, 244–45 (1974) (information about certain research projects funded by HEW not a trade secret or commercial), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); and *Brockway v. Department of Air Force,* 518 F.2d 1184, 1188 (8th Cir. 1975) (witness's statements about airplane crash, even though given in confidentiality to safety investigators, were not exempt because not commercial or financial information). *See generally* Davis, *Administrative Law of the*

*Seventies, supra* note 1, at § 3A.19. Thus it is not surprising that American argues here that the information it seeks is not "commercial information," a view adopted by Judge Duffy below, and that even if commercial the information is not "privileged or confidential" because its disclosure will not impair the Government's ability to obtain such information in the future or subject the IBT to cognizable competitive harm. American concedes that the information was "obtained from a person." *See generally* Note, *The Freedom of Information Act: A Seven-Year Assessment,* 74 Colum.L.Rev. 895, 948–53 (1974).

The first question, then, is whether the number of authorization cards submitted is commercial information. The legislative history is of limited assistance to us because the words "commercial or financial" were added to the 1964 bill, S. 1666, 88th Cong., 2d Sess. (1964), when it was reintroduced in 1965 as S. 1160, and the congressional reports on S. 1160 simply adopted the Senate Report on the 1964 bill, S.Rep.No.1219, 88th Cong., 2d Sess. (1964), without altering the commentary specifically to reflect the addition of these words, *see Consumers Union, supra,* 301 F.Supp. at 802,[13] except as below stated. Professor Davis considers Exemption 4 to be "probably the most troublesome provision in the Act," *Administrative Law Treatise* § 3A.19, at 146 (1970 Supp.), and the professor's commentary plainly destroys the explanation of this language in the Attorney General's Memorandum which would have exempted information that was not

13. The pertinent part of H.Rep.No.1497, 89th Cong., 2d Sess. 10, *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 2418, 2427, provides:

Trade secrets and commercial or financial information obtained from any person and privileged or confidential: This exemption would assure the confidentiality of information obtained by the Government through questionnaires or through material submitted and disclosures made in procedures such as the mediation of labor-management controversies. It exempts such material if it would not customarily be made public by the person from whom it was obtained by the Government. The exemption would include business sales statistics, inventories, customer lists, scientific or manufacturing processes or developments, and negotiation positions or requirements in the case of labor-management mediations. It would include information customarily subject to the doctor-patient, lawyer-client, or lender-borrower privileges such as technical or financial data submitted by an applicant to a Government lending or loan guarantee agency. It would also include information which is given to an agency in confidence, since a citizen must be able to confide in his Government. Moreover, where the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations.
(Footnote omitted.)

even "commercial or financial." In the cases cited above, at least, the professor's views have carried the day with the courts.

This does not mean, however, that in seeking to determine the scope of the exemption for commercial information we can or should discard the legislative history altogether. Whatever other uncertainties may surround the "commercial or financial" language, at least in the view of the House of Representatives it protects the confidentiality of the information that American seeks. The House Report, see note 13 supra, did amend the commentary to speak of "disclosures made in procedures such as the mediation of labor-management controversies" and state that the exemption would include "negotiation positions or requirements in the case of labor-management mediations." Moreover, the House added this language to the Senate's legislative history after holding hearings on the bill and apparently in direct response to a request by a spokesperson for the National Mediation Board for express protection of labor-management mediation proceedings and information. The House took the view that the phrase "commercial or financial" included labor-related information of this nature, i. e., pertaining to "negotiation positions" (to which a representation election is a prelude). It amended the legislative history accordingly.[14] In a statute with as con-

14. The text of the House Report, supra note 13, refers by way of footnote to testimony from the hearing before the House subcommittee that was considering the Freedom of Information Act. At that hearing H. T. Herrick, general counsel for the Federal Mediation and Conciliation Service, appeared to request an expansion of Exemption 4 to reflect expressly the confidentiality of information acquired during mediation or conciliation of labor disputes. Mr. Herrick emphasized how dependent the mediator's effectiveness is on keeping the parties' confidences:

> [I]n any tabulation of the qualities that a mediator should have before he can be truly skilled, one thing is absolutely essential: He must be able to earn and keep the confidence of the parties. . . .
> . . . No mediator can possibly play this role if the parties think that the things he learns in confidence will be told to the public—which includes the party on the other side of the bargaining table.

Bills to Amend Section 161 of the Revised Statutes with Respect to the Authority of Federal Officers and Agencies to Withhold Information and Limit the Availability of Records: Hearings on H.R.5012 et al. Before the Subcomm. on Foreign Operations and Government Information of the House Comm. on Government Operations, 89th Cong., 1st Sess. 37 (1965) (statement of H. T. Herrick).

Mr. Herrick also explained the Service's regulation authorizing nondisclosure:

> We feel that labor and management and other interested parties must be assured that information which is given to Commissioners and other employees of the Service will not be disclosed, and the regulation goes on to classify the files, reports, letters, memorandums, et cetera, which are basically our case files.

Id. at 40. In response, Representative Monagan acknowledged that "while a dispute is ac-

tively going on, . . . it would seem to me that there would not be much question about the fact that communications of the sort that you mentioned should be kept protected at that time." Id.

Mr. Herrick addressed his comments to the original version of the bill, in which Exemption 4 did not contain the "commercial or financial" language, apparently because at the time that the House Committee asked the Service to consider the proposed legislation, the bills had not yet been amended. By the time the hearings were held, however, the bill had been amended to include the disputed "commercial or financial" language, although apparently no one alerted Mr. Herrick to this development. Under the Service's proposal to amend the earlier version of the act the exemption would have read "[t]rade secrets and other information obtained from the public and customarily privileged or confidential, or information acquired during mediation or conciliation of labor disputes." The Service also requested incorporation of the following language into the committee report of the legislative history: "The exception would also include information given to Federal mediators in the regular performance of their duties in mediating and conciliating labor disputes." Id. at 42. These changes were required, Mr. Herrick felt, to make it clear that the relationship between the mediator and the disputants was included in the exemption for the traditionally privileged information between lawyer and client to which the Senate Report already referred.

At the conclusion of Mr. Herrick's statement, Representative Griffin expressed his agreement with Mr. Herrick's position: "I think there is [a lawyer-client] relationship that the mediator has with the parties to collective bargaining. Even though they might both be present, they are dealing jointly on a confidential basis within the room where the bargaining is taking place. I do not think that either party would

fused and tortured a legislative history as this one, one House's version must be accorded great weight, absent compelling contraindications, which American does not here provide.

▮ Evidently the district court thought, and American argues, that the information sought is not commercial or financial because the IBT does not have profit as its primary aim. This interpretation gives much too narrow a construction to the phrase in question. "Commercial" surely means pertaining or relating to or dealing with commerce. Labor unions, and their representation of employees, quite obviously pertain to or are related to commerce and deal with the commercial life of the country. The cases on which American relies are entirely inapposite. *Getman v. NLRB, supra,* involving lists of employees' names and addresses, is the closest; but the employers there did not receive a promise of confidentiality, and the information in and of itself served no commercial function. Here the information sought directly affects the status of the union's effort to obtain majority support and ultimate certification. The Board has traditionally treated this information as confidential, and the

union provides it under the express promise of confidentiality in the regulations above set forth. In *Washington Research Project, Inc., supra,* there was insufficient proof that the information was commercial; the court held that the National Institute of Mental Health scientists were not engaged in "trade or commerce" or that in any event their commercial interest in their work was "extremely remote." Here the commercial nature of the information is apparent.

We cast aside as quite irrelevant to a construction of the FOIA American's reliance upon the Clayton Act, 15 U.S.C. § 17,[15] and the exemption of labor organizations from the antitrust laws. The Clayton Act's exclusion of "labor of a human being" from regulation as a commodity or article of commerce does not detract from the clearly commercial nature of the activity of a labor organization seeking to organize and its substantial effect on commerce. American's reliance on the definition of a labor organization in the Labor Management Relations Act, 29 U.S.C. § 152(5) [16] is even less helpful to its position. That Act after all was enacted as an exercise of the Commerce power.[17]

---

expect that what they are saying within the confines of that room would be made public." *Id.* at 45. At the conclusion of the hearing, Representative Griffin assured Mr. Herrick that "I feel confident that some of the committee, if it does enact this legislation, would certainly implement your suggestion in someway to make sure that that is done." *Id.* at 46.

As noted above, the House Report did in fact refer to Mr. Herrick's testimony as support for its exemption from disclosure of the mediation of labor-management controversies as "commercial or financial information obtained from any person and privileged or confidential." Thus, by incorporating the reference in the legislative history to labor mediation even while retaining the newly amended "commercial or financial information" clause, the House, it may be inferred, "intended" that matters pertaining to labor mediation were exempt as "commercial." This history cannot be considered conclusive, however, for there is nothing in the legislative history by which the Senate may be said to have acquiesced in this interpretation.

**15.** 15 U.S.C. § 17 provides:

The labor of a human being is not a commodity or article of commerce. Nothing con-

tained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

**16.** 29 U.S.C. § 152(5) provides:

The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

**17.** *UAW v. Wisconsin Employment Relations Bd.,* 351 U.S. 266, 271, 76 S.Ct. 794, 100 L.Ed. 1162 (1956); *International Bhd. of Teamsters v. W. L. Mead, Inc.,* 230 F.2d 576 (1st Cir.), *cert. dismissed,* 352 U.S. 802, 77 S.Ct. 21, 1 L.Ed.2d 37 (1956).

Relying upon the two-pronged test set forth originally by the District of Columbia Circuit (in an opinion written by Judge Lumbard of the Second Circuit, sitting by designation) and adopted for our circuit in *Continental Stock Transfer & Trust Co. v. SEC,* 566 F.2d 373, 375 (2d Cir. 1977), American also argues that the information here submitted was not "confidential." In *Continental,* we said that "[t]he information to be confidential must have the effect either (1) of impairing the government's ability to obtain information—necessary information—in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained." We do not dwell on the first prong of this test—the ability of the Government to obtain such information—because in the context of certifying a bargaining representative the Government of course can legitimately require disclosure. We also need not address the more recent criticism that both the courts and Professor Davis have leveled at the restrictiveness of the "competitive disadvantage" concept. *See Washington Research Project, Inc. v. HEW, supra,* 504 F.2d at 244; Davis, *Administrative Law of the Seventies* § 3A.19, at 91, because in this case we find that the standard was met. It seems apparent that the disclosure of this information which was supplied on a confidential basis would adversely affect the union's competitive position vis-a-vis both other unions and the employer itself. Not only does the union supply this information in reliance upon the promise in the regulations that the Board will keep the information confidential, a promise perhaps not binding upon the courts in their construction of the FOIA, although certainly entitled to the court's careful consideration,[18] but the information relates to the very delicate area of labor relations with which as we pointed out in *Title Guarantee, supra,* and the Supreme Court pointed out in *Robbins Tire & Rubber Co., supra,* the courts should be very hesitant to interfere.

What we have said suffices to reverse the judgment and support our holding that the information sought is exempt. We must comment, however, upon American's argument in its brief on appeal that the real purpose for which it seeks the information is to determine whether the Board is fraudulently or otherwise violating its regulations by ordering the initiation of investigations where the union has not satisfied the thirty-five percent showing of interest requirement. American says that it requested the information because it did "not wish[ ] to be subjected to a long, complicated, and expensive hearing as to what constitutes a craft or class unless the IBT has submitted the required percentage of authorizations to justify the initiation of such an investigation." There are two short and simple answers to this. First, as we sought to point out at the beginning of this opinion, the regulations do not require thirty-five percent authorizations at the time the Board initiates an investigation but at the time it orders an election. 29 C.F.R. § 1206.2, *supra* note 10. Second, if indeed, as American suggests, the Board has over an unspecified period of time acted arbitrarily by ignoring its own regulations and imposing a variety of unfair burdens on the air carriers, American already has sufficient information about past proceedings to prove this; and it does not need information about the current one. Indeed by its second FOIA request American sought the representation petitions in all 198 cases since July 4, 1967, including nine still pending, involving passenger service or seven other specified classes of air carrier employees. The Board, believing that certain records were no longer exempt, complied by releasing to American showings of interest in all cases closed by certification of a bargaining representative or closed more than two years before the request. Because the Board has commendably reached its own

---

18. For an argument that the courts should rely on equitable considerations to refuse to compel an officer to violate a confidence by disclosure, see K. Davis, *Administrative Law Treatise* § 3A.19, at 150–51 (1970 Supp.). *See also* K. Davis, *Administrative Law Treatise* § 5.32, at 400–01 (2d ed. 1978).

determination that these materials may be disclosed, we need not decide whether it would have been required to do so under the FOIA. American can certainly evaluate the Board's compliance with the regulations on the basis of the information already disclosed; if it has a legitimate objection to the Board's actions, it can present it in an appropriate proceeding.

Judgment reversed with directions to deny American's application for an order of disclosure.