Ernestine **ROBLES** et al.,
Appellants,

v.

**ENVIRONMENTAL PROTECTION AGENCY,** Appellee.

No. 72-2470.

United States Court of Appeals,
Fourth Circuit.

Argued April 3, 1973.

Decided Sept. 11, 1973.

Victor H. Kramer, Washington, D. C. (Richard B. Wolf, Washington, D. C., and Joel Zeldin, on brief) for appellants.

Andrew J. Graham, Asst. U. S. Atty. (George Beall, U. S. Atty., on brief), for appellee.

Before CRAVEN, RUSSELL and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This is a bizarre case, illustrative of the ignorance by even scientists of the dangerous properties of radioactive waste materials and of the hazards that may result from such ignorance. It arose out of the practice by a uranium processing plant of making available free of charge its uranium tailings[1] for use as clean fill dirt in connection with construction of private and public structures in the community of Grand Junction, Colorado, where the uranium processing plant was located. The practice, begun in 1950, continued until 1966, when the hazards incident to the use of such tailings were belatedly recognized. In the meantime, these tailings had been extensively used. Because of the obvious dangers connected with such use, the Environmental Protection Agency (hereinafter referred to as EPA), with the assistance of the Colorado Department of Health, undertook in 1970 to monitor the radiation levels in the homes and public structures where any of these tailings had been used. In addition, the homes and business or public structures were tested for radioactive emissions. In the course of this monitoring, some 15,000 homes were surveyed. The survey was extensive. In some of the homes an air sampler was placed for a week at a time on each of six occasions in the course of a year as a part of what was described as an "(I)ndoor radon daughter concentration level." In order to secure approval for such a survey from a homeowner, the government surveyors were instructed to advise orally the homeowner or occupier that the results of the survey would not be released to any one other than the owner or occupier and federal officials working on the problem. When the surveys were completed, the results were made available by the EPA to the Colorado Department of Health, in conjunction with which the survey was made. Through an arrangement with the Colorado Department of Health, the Development Director of the community can secure and make available to any "proper party" the results of the tests made on any specific structure. In addition, each owner of a structure surveyed has been given the results of the survey of his building.

The plaintiffs at first made formal request upon the defendant for the results of the survey as it applied to all public and private structures in the community. It later modified this request to cover only those structures in which the radiation levels exceeded the Surgeon General's "safety guidelines". The agency responded to this request by offering to provide the results but with the names and addresses of homeowners or occupiers deleted. It based its refusal to supply any of this information upon the exemptions set forth in subdivisions (4) and (6) of Section 552(b), 5 U.S.C. This was unacceptable to the plaintiffs, who then filed this action under the Freedom of Information Act[2] to compel disclosure. The defendant entered a motion to dismiss, and, in the alternative, a motion for summary judgment. The plaintiffs then submitted their cross-motion for summary judgment. When the

---

1. These tailings are described as a sand-like by-product of the uranium processing plant's mining operations.

2. 5 U.S.C., Section 552. *supra*

motions came on for hearing, the District Court denied plaintiffs' cross-motion and granted the defendant's motion for summary judgment, finding that disclosure, though not exempt under subdivision (4), was exempted under subdivision (6) of the Act. The plaintiffs appeal.

On this appeal, the defendant agency apparently concedes that it is obligated to disclose to the plaintiffs, without regard to their interest or want of interest, the information requested unless disclosure is "specifically" excused under one of the nine express exemptions set forth in the Freedom of Information Act, and that, in asserting an excuse for disclosure under any express exemption, "the burden is on" it "to sustain its action." Whether conceded or not, this is the clear purport of the Act itself. Epstein v. Resor (9th Cir. 1970) 421 F.2d 930, 933, cert. denied 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549. While it sought to excuse nondisclosure in this case under both exemptions (4) and (6) of the Act, its claim under (4) was disallowed by the District Court and, in this Court, the agency rests its right wholly upon exemption (6). Accordingly, the sole issue here is whether the District Court was correct in finding that the defendant agency had sustained its burden of establishing a right to exemption from disclosure of the requested information under exemption (6) of the Act.

Exemption (6) is as follows:

"(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;".

■ Obviously, the information requested was not included in any "personnel" or "medical" files as such. The basis for a claim of exemption must accordingly be found in the phrase, "similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The term "similar" was used, it seems, to indicate that, while the exemption was not limited to strictly medical or personnel files, the files covered in this third category must have the same characteristics of confidentiality that ordinarily attach to information in medical or personnel files; that is, to such extent as they contain " 'intimate details' of a 'highly personal' nature", they are within the umbrella of the exemption. This is the real thrust of the exemption as it was construed in Getman v. N. L. R. B. (1971), 146 U.S.App.D.C. 209, 450 F.2d 670, 675. See, Note, Invasion of Privacy and the Freedom of Information Act: Getman v. N.L.R.B., 40 Geo.Wash.L.Rev. 527, 532 (1972). It would seem to follow that the exemption applies only to information which relates to a specific person or individual, to "intimate details" of a "highly personal nature" in that individual's employment record or health history or the like, and has no relevancy to information that deals with physical things, such as structures as in this case.[3] The agency contends, however, that this is too simplistic an approach to the unique situation in this case. It is true, the agency argues, that, while the information sought by the plaintiffs relates strictly to the condition of structures, of buildings, and real estate, it was gathered, analyzed, and is of interest only as it relates to the possible effect of that condition on the health and well-being of the occupants of those structures, i.e., of specific persons and individuals. So viewed, in this broad context, the information, the agency contends, comes within the definition of information of a "highly personal nature", as contemplated in exemption (6).

---

3. *Cf.*, the language of Professor Davis in Administrative Law, 1970 Supp., Section 3A.22 at 164, where, in discussing exemption (6) and particularly the qualifying term "personal privacy", he says:

"I think 'personal privacy' always relates to individuals."

It must be conceded that there is a certain persuasiveness to this argument. The survey of the homes in the community was engaged in because of concern for personal health and safety; it was not an engineering survey to determine the structural adequacy or nature of the structures. And the reason for the health concern was the possibility that continued occupancy of the building might expose the occupants and even their progeny to hazards of health and even biological impairments. It is suggested that these potential health impairments could affect adversely employment opportunities and might even reduce marriage possibilities of the occupants.

■ Assuming, however, that it is possible to analogize these records to health records, it does not follow automatically that such records are exempt from disclosure. The statutory exemption does not simply cover any files that may be regarded as "similar" to health files. "Similar files", in order to qualify under the exemption, must fit the additional qualifications set forth in the exemption, *i.e.*, they must contain information "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." [4] The use of the term "clearly" in this qualification, which was not inadvertent but purposeful on the part of Congress, was, itself, a "clear" instruction to the Courts that, in determining the issue whether a disclosure would constitute "a clearly unwarranted invasion of personal privacy", they should "tilt the balance in favor of disclosure". Getman v. N.L.R.B. *supra*, at 674 of 450 F.2d.

■ In resolving against disclosure, the District Court relied strongly on the fact that the agency had in some instances promised the householder that the results of the survey would be kept confidential. While, perhaps, a promise of confidentiality is a factor to be considered, it is not enough to defeat the right of disclosure that the agency "received the file under a pledge of confidentiality to the one who supplied it. Undertakings of that nature cannot, in and of themselves, override the Act." Ackerly v. Ley (1969), 137 U.S.App.D.C. 133, 420 F.2d 1336, 1339–1340, n. 3; Legal Aid Society of Alameda County v. Shultz (D.C.Cal.1972) 349 F.Supp. 771, 776; *Davis, supra*, at 164. Particularly in this case is the alleged promise of confidentiality unavailing as an excuse. In the first place, the promise was given by the door-to-door surveyors only where confidentiality was specifically inquired about by a householder. The agency has offered no proof of how many householders in the community had received such promise. Even more important is the fact that the information has not been held in confidence. The results of the survey are available to the Colorado Department of Health. This Department, seemingly with the approval of EPA, readily makes available on request the results of the survey as to any specific structure through the City Director of Development.[5] This practice is well known to the EPA, which offers proof of the practice in support of its claim to exemption by reason of its promise of confidentiality. And it is of some significance that, so far as the record indicates, no householder has objected to this disclosure by the City Director of Development. Finally, it should be pointed out that this claim, that a promise of confidentiality supports the award of an exemption, is entirely inapplicable to public buildings.

■ Another reason urged by the agency for its denial of disclosure is that the need of the public, as well as the interest of the plaintiffs, in securing

---

4. One commentator has found this language unsatisfactory, adding that:

    "The ambiguous wording of exemption 6 and the traditional problems in securing the right to privacy may preclude creation of a completely satisfactory test." 40 Geo.Wash.L.Rev. 527, at p. 540 (1972).

5. *Cf.*, Wellford v. Hardin (D.C.Md.1970) 315 F.Supp. 175, 178, aff'd (4th Cir.) 444 F.2d 21.

the information "is negligible." This argument misconceives the plain intent of the Act. As Professor Davis has so convincingly emphasized, the earlier provision in the Administrative Procedure Act "provided for disclosure 'to persons properly and directly concerned.' That was changed to 'any person' ", demonstrating beyond argument that disclosure was never to "depend upon the interest or lack of interest of the party seeking disclosure." *Davis, supra*, Section 3A.4 at 120;[6] Bannercraft Clothing Company v. Renegotiation Board (1972) 151 U.S.App.D.C. 174, 466 F.2d 345, 352, n. 6, cert. granted 410 U.S. 907, 93 S.Ct. 967, 35 L.Ed.2d 269; Sterling Drug, Inc. v. F.T.C. (1971), 146 U.S.App. D.C. 237, 450 F.2d 698, 705; Skolnick v. Parsons (7th Cir. 1968) 397 F.2d 523, 525.

■ Equally unpersuasive is the argument that disclosure should be refused because it "would do more harm than good". Such an argument has nothing to do with "personal privacy" but is rather an argument that courts, in disposing of actions under the Act, may exercise discretion to grant or deny equity relief. While such argument has received some limited support, the better reasoned authorities find no basis for this balancing of equities in the application of the Act; indeed, the very language of the Act seems to preclude its exercise. Wellford v. Hardin (4th Cir. 1971) 444 F.2d 21, 24–25; Soucie v. David (1971) 145 U.S.App.D.C. 144, 448

F.2d 1067, 1077; Getman v. N.L.R.B., *supra*, at 677 of 450 F.2d; and Bannercraft Clothing Co. v. Renegotiation Board, *supra*, at 353 of 466 F.2d; *cf.*, however, General Services Administration v. Benson (9th Cir. 1969) 415 F.2d 878, 880, and Davis, *supra*, Sec. 3A.6, pp. 123–4.[7] Moreover, the claim of public harm is at best ambiguous. The only harm suggested by the agency involves the individuals whose homes were surveyed. Presumably, these individuals knew of the practice of the City Development Director of making available the information in question to any proper person requesting it. Yet no concerned individual, so far as this record shows, has ever objected; nor has the defendant agency instanced one case in which an individual householder has complained of any harm suffered by him as a result of disclosure. Nor, for that matter, has the defendant agency attempted in this case to show that any "specific governmental interests" will be harmed by the disclosure requested by the plaintiffs. *Cf.* Bristol-Meyers Company v. F.T.C. (1970) 138 U.S.App.D.C. 22, 424 F.2d 935, 938, cert. denied 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52.

■ The agency suggests that the information sought is of such a recondite scientific nature that the ordinary citizen could not properly evaluate or understand it. No one would question the ignorance of the general public—and perhaps, the scientific world, too—as to the possible harmful aspects of radioactive

---

6. In further elaboration on this point, Professor Davis, in his authoritative text, has said, at 121:

"* * * For instance, the sixth exemption in subsection (e) authorizes withholding of medical files if disclosure 'would constitute a clearly unwarranted invasion of personal privacy.' If the officer or judge finds that the disclosure will be an unwarranted invasion but is in doubt whether it is 'clearly unwarranted,' a natural approach to decision would be to weigh the privacy interest against the interest of the party seeking the information, so that disclosure would be made to one with a legitimate need but not to

one who is malevolently motivated or an officious intermeddler. But under the Act such a balancing is inappropriate. All parties are equal in satisfying the words 'any person.'"

7. *Benson* states the role of the court in actions under the Act as follows:

"In exercising the equity jurisdiction conferred by the Freedom of Information Act, the court must weigh the effects of the disclosure and nondisclosure, according to the traditional equity principles, and determine the best course to follow in the given circumstances. The effect on the public is the primary consideration." (415 F.2d at 880).

materials. The same could no doubt be said of much governmental information. Even census data is subject to misinterpretation and has prompted violent controversy even among experts. But the mere circumstance that information may not be fully understood is not among the "specific" exemptions authorized under the Act. Actually, it may well be that the very fact that the government so adamantly opposes release may give free rein to unbridled fear for the worst on the part of the people of this community; whereas, the release of the surveys, even though not fully understood, may have a beneficial, calming effect on the reasonable apprehensions of these citizens.

The Government has, it developed, embarked recently since discovery of the danger on a remedial program intended to remove or minimize the hazard of radioactive injury to the occupiers of these structures. The District Court felt that such a program militated against a determination that there was any public need for or benefit to result from disclosure. In balancing equities, it thought this of moment. But, as we have already observed, the right to disclosure under the Act is not to be resolved by a balancing of equities or a weighing of need or even benefit. The only ground for denial of disclosure in this situation is that the disclosure would represent a "clearly unwarranted invasion of personal privacy." For the reasons given, we are unable to find any reasonable basis for finding such a "clearly unwarranted basis."

Reversed, with direction to the District Court to enter a decree granting disclosure as provided in Section 552, 5 U.S.C.

WIDENER, Circuit Judge (concurring and dissenting):

I must respectfully dissent with respect to those who made an agreement with the government in good faith that the information disclosed about their "private homes" would be kept confidential, particularly those who are yet in possession of the premises involved. What I say does not apply to "public buildings." The words "private homes" and "public buildings" are quoted from the complaint.

I am of opinion that the statute does not require blanket disclosure, to complete strangers, of information which the government obtained under a good faith agreement that it would not be disclosed. For persons who so agreed, I believe the files of information concerning their homes are ". . . similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

There is no question but that giving out this information promiscuously to strangers is an invasion of personal privacy. Disclosure of a specifically agreed upon confidential communication from citizen to sovereign may be considered no less. The question is whether or not it is clearly unwarranted. If the person seeking the information has any colorable interest in obtaining it, I think it may not be the clearly unwarranted invasion contemplated by the statute. These plaintiffs, however, insist that they need have no connection with the premises involved, no matter how remote, in order to get the information sought. Webster's New International Dictionary, 2nd Edition, defines unwarranted as "Not warranted; being without warrant, authority, or guaranty." Plaintiffs' right to interfere, having no interest they have chosen to disclose, is, in my opinion, clearly without warrant or authority, and ought not to be allowed.

With respect to these particular plaintiffs, in their search for information about the private homes of others, I agree with the district court when it stated: "As the House Report accompanying this legislation indicated, a citizen must be able to confide in his Government. When the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor this obligation."