577 F.2d 1172
 99 L.R.R.M. (BNA) 2048, 84 Lab.Cas. P 10,757
 PACIFIC MOLASSES COMPANY, Plaintiff-Appellee, Cross-Appellant,
v.
NATIONAL LABOR RELATIONS BOARD REGIONAL OFFICE # 15 and
Charles M. Paschal, Jr., Regional Director, National Labor
Relations Board Region # 15 and John S. Irving, General
Counsel, National Labor Relations Board, Defendants-
Appellants, Cross-Appellees.
 No. 77-1886.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 8, 1978.
 
 John S. Irving, Gen. Counsel, Aileen Armstrong, Asst. Gen. Counsel, John E. Higgins Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, Washington, D.C., Susan T. Papadopoulos, Atty., N.L.R.B., Washington D.C., Carol A. De Deo, Atty., N.L.R.B., Washington, D.C., for defendants-appellants, cross-appellees.
 Allan M. Dabrow, Stephen J. Cabot, Philadelphia, Pa., Robert McComiskey, New Orleans, La., Kenneth M. Jarin, Philadelphia, Pa., for plaintiff-appellee, cross-appellant.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before SKELTON*, Senior Judge, and FAY and RUBIN, Circuit Judges.
 FAY, Circuit Judge:
 
 
 1
 This appeal presents issues of first impression for this Court. We are asked initially to decide whether an employer can use the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to obtain copies of the individual union authorization cards that were submitted to the National Labor Relations Board (N.L.R.B.) in support of a petition by the union for a representation election. We are also asked to determine whether a report (N.L.R.B. Form 4069) made by a Board agent is likewise subject to disclosure under the Freedom of Information Act. The district court ruled that the FOIA compelled disclosure of the union authorization cards, but that the Form 4069 was exempted from disclosure. For the reasons stated infra, we vacate the order of the district court, and order that the union authorization cards be withheld from disclosure, but that the Form 4069 be made available to the plaintiff.I. FACTS
 
 
 2
 The plaintiff in this case, the Pacific Molasses Company, operates a bulk liquid storage and distribution business in Westwego, Louisiana. On February 11, 1977, the Oil, Chemical and Atomic Workers International Union filed with the N.L.R.B.'s Fifteenth Regional Office a petition requesting that the Board conduct an election in a unit consisting of the company's production and maintenance employees to determine whether the employees desired to be represented by the union for collective bargaining purposes. The petition was filed pursuant to Section 9 of the National Labor Relations Act, 29 U.S.C. § 159(c), and it alleged that the bargaining unit in question consisted of twenty-seven employees and that the petition was supported by 30% or more of such employees. The N.L.R.B.'s Statement of Procedures, 29 C.F.R. § 109.18(a), provides that the petitioning union must be the authorized agent of at least 30% of the employees in the proposed unit in order to establish a showing of interest of a "substantial number of employees" as required in 29 U.S.C. § 159(c)(1)(A). In order to demonstrate an adequate "showing of interest", the union submitted to the Board authorization cards signed by employees designating the union as their collective bargaining representative.[1]
 
 
 3
 On the same date that the union's petition was filed, the Board sent a copy of the petition to the plaintiff and requested an alphabetized list of all employees in the group described in the petition. The purpose of such a list was to aid the Board in determining whether there has been an adequate showing of interest. The plaintiff failed to furnish the requested list, and a Board agent was subsequently assigned to investigate the petition. After examining the authorization cards, the agent submitted a report (N.L.R.B. Form 4069) to the Board's regional director. The Form 4069 is a statistical report which discloses the number of employees in the prospective unit, the number of signed authorization cards, and the percentage of employees in the unit who support the union.
 
 
 4
 By letter dated March 11, 1977, the plaintiff made a formal request to the regional director of the Board to disclose the union authorization cards and the Form 4069. According to the plaintiff, the purpose behind the request was "to attack the validity of the signatures, the manner in which the cards were solicited and the accuracy of the dates of the cards." App. 114a-115a. This request was denied by the regional director on March 16, 1977, and the regional director's decision was affirmed by the General Counsel of the N.L.R.B. on April 7, 1977.
 
 
 5
 Earlier, on March 15, 1977, a representation hearing was held by the Board to determine the appropriateness of the unit. Specifically, the purpose of the hearing was to ascertain whether all of the employees whom the union sought to represent shared a community of interest which would justify their collective representation by the union. As a result of this representation hearing, the regional director issued on March 31, 1977, a Decision and Direction of Election, and ordered that the election be held on April 29, 1977.
 
 
 6
 The plaintiff filed the complaint in this cause of action in the District Court for the Eastern District of Louisiana on April 19, 1977. The complaint sought an order requiring the Board to produce the union authorization cards and the Form 4069, and an order restraining the Board from proceeding in this representation case until the requested information was produced. The district court held a hearing to consider the merits of the plaintiff's complaint, and on April 27, 1977, the district court entered the order which is the subject of this appeal. This order instructed the Board to produce for the plaintiff the union authorization cards based on the fact that these cards did not fall under Exemptions 6, 7(A), 7(C) or 7(D) of the FOIA. The district court, however, did deny the plaintiff's requests for injunctive relief and the Form 4069 (relying on Exemption 5 of the FOIA).
 
 
 7
 Immediately after the district court entered its order, counsel for plaintiff requested that the Board turn over the union cards. The Board denied this request, and this denial prompted the plaintiff to file a motion asking the district court to cite the Board for contempt. On April 28, 1977, the district court ordered the Board to permit the company to view and copy the authorization cards within three hours or be held in contempt of court. Later, on the same day, pursuant to a motion by the Board, this Court issued a stay of the district court's order to disclose the authorization cards pending the resolution of the Board's appeal. On April 28, 1977, the Board filed its notice of appeal with this Court. On May 20, 1977, the company filed a notice of cross-appeal from that part of the district court's judgment concerning the Form 4069.
 
 
 8
 On April 29, 1977, the representative election was conducted at the plaintiff's facility. The employees rejected the petitioning union by a vote of 13 to 9.
 
 II. THE UNION AUTHORIZATION CARDS
 
 9
 Union authorization cards are cards signed by employees authorizing a certain union to represent them for all purposes of collective bargaining in respect to wages, hours and other conditions of employment. See 29 U.S.C. § 159(a). During an organizational campaign, employees are asked to sign a card. The union collects these cards, and, when 30% of the employees' signatures have been collected, the union sends the cards along with a petition for a representation election to the regional director of the N.L.R.B. See 29 U.S.C. § 159(c). The director will then review the petition, and, if satisfied by the showing of support, will order a hearing. At the hearing, the employer can challenge such items as the appropriateness of the bargaining unit. The employer cannot, however, challenge the N.L.R.B.'s determination that there exists a sufficient showing of interest among the employees for the union to warrant the holding of an election. That is an issue to be determined by the N.L.R.B. alone. Linden Lumber v. N.L.R.B., 419 U.S. 301, 309, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). That does not mean, however, that if a party suspects fraud in the process used by the union to obtain the cards that it cannot obtain a check on the validity of the cards. The Board's manual provides that:
 
 
 10
 If it appears that signatures are in the same handwriting, or if a party alleges and furnishes evidence that there are forgeries, such investigation should be made as is necessary and suitable action taken, including possible referral to other law enforcement agencies.
 
 
 11
 The investigation should include, but not be limited to, attempts to obtain affidavits from the person or persons responsible for procuring and submitting the cards. A signature comparison should be made preferably against the employer's records. Persons purporting to have been signators should be questioned.
 
 
 12
 N.L.R.B. Case Handling Manual § 10128.1, cited in Brief of Appellant at S.A.6.
 
 
 13
 If the N.L.R.B. should order an election to be held, the employees then vote for or against the union by secret ballot. 29 U.S.C. § 159(c)(1). Thus, the employer is generally prevented from finding out at any time which employees have supported the union. The principal exception to this is in a situation wherein the union collects authorization cards from over 50% of the employees in the unit. In such a situation, the union might present these cards to the company with the expectation of obtaining voluntary recognition of the union from the employer. The frequency of this practice of going to the employer with authorization cards is, however, on the decline as a result of the relatively recent Supreme Court decision holding that a company does not commit an unfair labor practice by demanding a representation election even though the union has presented to it the signed authorization cards of over 50% of the affected employees. Linden Lumber v. N.L.R.B., 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974).[2]
 
 
 14
 Since the authorization cards in the case before us are now in the possession of the N.L.R.B., the plaintiff claims that they are government records subject to disclosure under the FOIA. The N.L.R.B. counters by arguing that the cards are exempted from disclosure by Exemptions 6 and 7 of the FOIA. We are of the opinion that Exemption 6, which provides for the non-disclosure of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," is controlling in this situation, and, as a result, it is unnecessary for us to discuss the applicability of the seventh exemption.
 
 
 15
 The Freedom of Information Act was enacted to remedy the inadequacies of § 3, the public disclosure section, of the Administrative Procedure Act, 5 U.S.C. § 1002 (1964). The FOIA was broadly conceived as it sought "to permit access to official information long shielded unnecessarily from public view . . . ." Environmental Protection Agency v. Mink, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). The legislative history of the Act indicates an intent by Congress to reflect "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." S.Rep. No. 813, 89th Cong., 1st Sess., 3 (1965) (hereinafter S.Rep. No. 813). An integral part of the act, therefore, is the nine enumerated exceptions. As the Senate Committee pointed out:
 
 
 16
 At the same time that a broad philosophy of "freedom of information" is enacted into law, it is necessary to protect certain equally important rights of privacy with respect to certain information in Government files, such as medical and personnel records. It is also necessary for the very operation of our Government to allow it to keep confidential certain material, such as the investigatory files of the Federal Bureau of Investigation.
 
 
 17
 It is not an easy task to balance the opposing interests, but it is not an impossible one either. It is not necessary to conclude that to protect one of the interests, the other must, of necessity, either be abrogated or substantially subordinated. Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure.
 
 
 18
 S.Rep. No. 813, p. 3.
 
 
 19
 The N.L.R.B. argues that Exemption 6 of the FOIA, 5 U.S.C. § 552(b)(6), provides a basis for withholding the union authorization cards. To qualify under Exemption 6, the requested information must consist of "personnel, medical or similar files," and the disclosure of the material must constitute a "clearly unwarranted invasion of personal privacy." Since the affected files of the N.L.R.B. cannot be construed as personnel or medical files, our initial inquiry must focus in on whether this information can be considered "similar files" within the meaning of the Act. If the authorization cards do fall within the definition of "similar files", we must then consider whether their disclosure would constitute a clearly unwarranted invasion of personal privacy.
 
 
 20
 There is not a great deal of judicial or legislative history defining the scope of Exemption 6. The Senate Report dedicated only two paragraphs to the exemption,[3] and the House Report was equally as brief.[4] The primary thrusts of these Reports emphasize that Exemption 6 was intended as a general exemption to protect the privacy rights of individuals who, for one reason or another, are required to submit personal information to the government. The terms "personnel" and "medical" files were used in order to give examples of the type of information which Congress felt was deserving of protection. Because the element shared by personnel and medical files is the personal quality of the information contained, the test for determining whether the information is a "similar file" must turn on whether the information is of a sufficiently personal nature.
 
 
 21
 The Supreme Court has affirmed that it is the personal nature of the information which determines whether it is protected by Exemption 6. In Dept. of Air Force v. Rose, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), student editors of the New York University Law Review sought access to case summaries (with personal references or other identifying information deleted), maintained in the Honor and Ethics Code reading files of the United States Air Force Academy. The Supreme Court ultimately remanded the case to the district court for an in camera review of the case summaries and a determination of whether disclosure of the case summaries would constitute a clearly unwarranted invasion of personal privacy. In so doing, however, the Court did shed some light on Exemption 6. The Court explained that the primary concern of Congress in drafting Exemption 6 "was to provide for the confidentiality of personal matters in such files as those maintained by the Department of Health, Education, and Welfare, the Selective Service, and the Veterans' Administration." Id. at 375 n. 14, 96 S.Ct. at 1606. Also, the Court relied heavily on the personal nature of case summaries in determining that these summaries fell into the category of "similar files." The Court explained:
 
 
 22
 Two attributes of the case summaries require that they be characterized as "similar files." First, they relate to the discipline of cadet personnel, and while even Air Force Regulations themselves show that this single factor is insufficient to characterize the summaries as "personnel files," it supports the conclusion that they are "similar." Second, and most significantly, the disclosure of these summaries implicates similar privacy values; for as said by the Court of Appeals (2 Cir.), 495 F.2d (261), at 267, "identification of disciplined cadets a possible consequence of every anonymous disclosure could expose the formerly accused men to lifelong embarrassment, perhaps disgrace, as well as practical disabilities, such as loss of employment or friends.
 
 
 23
 Id. at 376, 96 S.Ct. at 1606 (emphasis added).
 
 
 24
 Other Courts of Appeal which have dealt with the question of what constitutes a "similar file" have placed just as great an emphasis on the personal nature of the requested information. The Third Circuit in Wine Hobby U.S.A., Inc. v. I.R.S., 502 F.2d 133 (3rd Cir. 1974) held that the names and addresses of those people who had registered with the government to produce wine for family use were protected by Exemption 6. In so holding the Court explained:
 
 
 25
 We believe that the list of names and addresses is a "file" within the meaning of Exemption (6). A broad interpretation of the statutory term to include names and addresses is necessary to avoid a denial of statutory protection in a case where release of requested materials would result in a clearly unwarranted invasion of personal privacy. Since the thrust of the exemption is to avoid unwarranted invasions of privacy, the term "files" should not be given an interpretation that would often preclude inquiry into this more crucial question.
 
 
 26
 Furthermore, we believe the list of names and addresses is a file "similar" to the personnel and medical files specifically referred to in the exemption. The common denominator in "personnel and medical and similar files" is the personal quality of information in the file, the disclosure of which may constitute a clearly unwarranted invasion of personal privacy. We do not believe that the use of the term "similar" was intended to narrow the exemption from disclosure and permit the release of files which would otherwise be exempt because of the resultant invasion of privacy.
 
 
 27
 Id. at 135.
 
 
 28
 The District of Columbia Court of Appeals was equally as concerned with the personal nature of the information sought when it held that a report by the Department of Agriculture on governmental housing discrimination fell within the definition of "similar files." In Rural Housing Alliance v. United States Dept. of Agr., 162 U.S.App.D.C. 122, 498 F.2d 73 (1974), the Court stated that:
 
 
 29
 (W)e believe that the investigatory report comes well within the ambit of exemption 6. That exemption was designed to protect individuals from public disclosure of intimate details of their lives, whether the disclosure be of personnel files, medical files, or other similar files. The exemption is not limited to Veterans' Administration or Social Security files, but rather is phrased broadly to protect individuals from a wide range of embarrassing disclosures. As the materials here contain information regarding marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights, reputation, and so on, it appears that the report involves sufficiently intimate details to be a "similar" file under exemption 6.
 
 
 30
 Id., 162 U.S.App.D.C. at 125-26, 498 F.2d at 76-77.[5]
 
 
 31
 The Third Circuit is the only Circuit that has had the opportunity to consider the specific question before us. In ruling that the union authorization cards did fall within the definition of "similar files," the Court relied on the previously mentioned Wine Hobby opinion. The Court stated:
 
 
 32
 The first hurdle, then, is to determine whether the union cards held by the NLRB are "similar files." We will not construe this term in a narrow, technical way if to do so would defeat the purpose of exemption 6. Wine Hobby, supra at 135 (broad interpretation necessary to allow crucial inquiry of privacy invasion). The Supreme Court has indicated approval of our broad interpretation. See Dept. of Air Force v. Rose, 425 U.S. 352, 375 n.14, 96 S.Ct. 1592, 1605, 48 L.Ed.2d 11 (1976) ("There is sparse legislative history as to the precise scope intended for the term 'personnel files,' a detail which itself suggests that Congress intended that particular characterization not to be critical in the application of Exemption 6").
 
 
 33
 Even recognizing a limitation that exempt files must in some way be "similar" to personnel and medical files we still categorize the union cards as similar files. The cards contain what is, in effect, a thumbnail sketch of an employee's job classification and status, in addition to the union authorization. Thus, we have no difficulty in deciding that the cards are "similar files."
 
 
 34
 Committee on Masonic Homes, etc. v. N.L.R.B., 556 F.2d 214, 219-220 (3rd Cir. 1977).
 
 
 35
 It is rather apparent to us that the determining factor in deciding whether information contained in government files is protected from disclosure hinges on the personal nature of that information. Given this as our starting point, we have no trouble holding that the personal preference of employees with regard to whether or not they desire union representation is sufficiently personal in nature to fall within the definition of "similar files."
 
 
 36
 The more crucial inquiry, however, is not whether these cards are " similar files," but whether the disclosure of them would be "a clearly unwarranted invasion of privacy." In making this determination, it is necessary to balance those interests of an individual in having his private affairs protected from public scrutiny with the desire to preserve as best as possible the public's right to governmental information. See S.Rep. No. 813, p. 9; Dept. of Air Force v. Rose, 425 U.S. 352, 372, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). The Third Circuit in Masonic Homes had little trouble in finding that disclosure would be an invasion of privacy. The Court initially posed that question, and then stated:
 
 
 37
 The answer is a simple yes. An employee who signed a card was entitled to a private choice, given the policies of the N.L.R.A.
 
 
 38
 556 F.2d at 220. In making the determination that disclosure would involve a "serious" privacy invasion, the Court relied on several factors. The Court explained that:
 
 
 39
 (I)t is entirely plausible that employees would be "chilled" when asked to sign a union card if they knew the employer could see who signed. If so, this is a harm that could not easily be corrected. To order disclosure here would effectively do away with union cards as they are used now. We need only consider whether employees would be as likely to sign a prominently displayed notice at work, "Sign up for the union here. Organize for better working conditions and higher wages." Solicitation of authorization cards plays a vital role in organizational campaigns, and we cannot envision a workable substitute.
 
 
 40
 Furthermore, union elections must be conducted by secret ballot. Whatever reasons and policies lie behind that would be directly undercut by forcing employees to acknowledge in public their support of the union, in order to be given the right to vote in secret for the union.
 
 
 41
 Id. at 221.
 
 
 42
 The Masonic Homes Court had little trouble in finding that the public interest involved in disclosure would be minimal. The Court rejected the plaintiff's suggestion that the public could benefit as taxpayers by saving the expense of an election since disclosure might reveal certain fraudulently obtained signatures. The Court reasoned:
 
 
 43
 If this is a benefit, we fear it would be easily off-set by the inevitable card challenge hearings and concomitant appeals.
 
 
 44
 Id. at 220. The court further explained that "if the basic thrust of the Act is to inform the electorate of the ways in which government agencies operate, the cards will disclose nothing." Id. The Court then ended its discussion of Exemption 6 by saying:
 
 
 45
 Having found a serious violation of privacy and no significant public interest in disclosure, we conclude that the union authorization cards are exempt from disclosure, under section 552(b)(6) of the Freedom of Information Act, 5 U.S.C. § 552.
 
 
 46
 We agree with the Third Circuit, and feel that the Freedom of Information Act does not compel disclosure of these cards. In so holding, we are recognizing that employees have a strong privacy interest in their personal sentiments regarding union representation,[6] and that this right to privacy is a right necessary to full and free exercise of the organizational rights guaranteed by the National Labor Relations Act.
 
 
 47
 In this case, it is impossible to minimize the seriousness of the threatened invasion. We would be naive to disregard the abuse which could potentially occur if employers and other employees were armed with this information. The inevitable result of the availability of this information would be to chill the right of employees to express their favorable union sentiments. Such a chilling effect would undermine the rights guaranteed by the N.L.R.A., and, for all intents and purposes, would make meaningless those provisions of the N.L.R.A. which guarantee secrecy in union elections.
 
 
 48
 While it is clear that the disclosure of the authorization cards would be a serious invasion of the privacy of the card signers, it is equally apparent that the public benefit from disclosure would be minimal. The only public interest advanced by the plaintiffs is the need for public oversight of the Board's showing of interest determination. The thrust of this argument is that:
 
 
 49
 (T)he public would have an opportunity to verify the signatures on the cards. This would assure the public of the necessity as well as the likelihood of a fairly conducted election. . . . Disclosure would also lead to an actual saving of tax monies, because in many instances the expense of conducting an election would be avoided.
 
 
 50
 Brief of Appellee at 24.
 
 
 51
 We cannot accept the plaintiff's argument, and we feel that there is little if any public benefit to be gained from disclosure. The N.L.R.B. has already set up procedures that can deal with any suspected fraud which might occur in the obtaining of the signature cards,[7] and certainly the secret ballot election ultimately protects the employer from any threat of having to recognize a union that is not supported by 50% of the affected employees. We are also unable to see the possibility of any potential tax savings which would be so great as to justify the serious infringements on the employees' right to privacy. We hold, therefore, that disclosure of these cards would result in a serious invasion of the personal privacy of the affected employees with no counterbalancing benefit to be obtained for the public. As a result, these cards are exempted from disclosure under the Freedom of Information Act, 5 U.S.C § 552(b)(6).
 
 III. FORM 4069
 
 52
 The plaintiff in this case has cross-appealed from the district court's ruling that the Form 4069 could properly be withheld from disclosure under Exemption 5 of the FOIA. Exemption 5 protects:
 
 
 53
 inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency . . . .
 
 
 54
 The Supreme Court has recognized that while the language of Exemption 5 contemplates that the public is entitled to all memoranda or letters that a private party could discover in litigation with an agency, drawing a line between what is and is not discoverable can be very difficult. EPA v. Mink, 410 U.S. 73, 86, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). It is settled, however, that confidential intraagency advisory opinions are privileged from inspection, and the policy reason supporting this privilege is the need for " 'open, frank discussion between subordinate and chief concerning administrative action.' " Id. at 87, 93 S.Ct. at 836, quoting Kaiser Aluminum Chemical Corp. v. United States, 157 F.Supp. 939, 946, 141 Ct.Cl. 38 (1958). The importance of this policy is reflected in the legislative history of the exemption. The Senate Report noted that "it would be impossible to have any frank discussion of legal or policy matters in writings if such writings were to be subjected to public scrutiny." S.Rep. No. 813, p. 9. The privilege that has been held to attach to intragovernmental memoranda does, however, have finite limits, and one of these limits is that memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda but severable from its context is generally available for discovery by private parties in litigation with the Government. Exemption 5, therefore, "requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other." Id. at 89.
 
 
 55
 The distinction between "purely factual" material as opposed to information which is "deliberative in nature" is the factor which controls whether the Form 4069 should be disclosed. In our opinion, the Form 4069 is little more than a mechanically compiled statistical report which contains no subjective conclusions, and, as a result, must be considered "purely factual" in nature and thus not protected from disclosure by Exemption 5.[8]
 
 
 56
 In addition to claiming Form 4069 exempt from disclosure under Exemption 5, the N.L.R.B. claims in their brief that the form is exempt from disclosure under Exemption 7(A), which protects:
 
 
 57
 (I)nvestigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings . . . .
 
 
 58
 5 U.S.C. § 552(b)(7)(A). The Supreme Court has recently dealt extensively with Exemption 7(A) in N.L.R.B. v. Robbins Tire & Rubber Co., --- U.S. ----, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). The Robbins Tire case involved whether the N.L.R.B. should be required to disclose, prior to its hearing on an unfair labor practice complaint, statements of witnesses whom the Board intended to call at the hearing. The Supreme Court decided that the N.L.R.B. need not disclose the requested information but in so doing the Court placed great emphasis on the existence of an actual, ongoing labor enforcement proceeding.[9] In our case, there is no pending labor enforcement proceeding. Also, it would appear that since the union lost the election and apparently raised no objections, there is not even an ongoing investigation nor the likelihood of any future law enforcement proceeding which could be jeopardized by disclosure of the Form 4069. As a result, we hold that Form 4069 is not protected from disclosure by Exemption 7(A).
 
 IV. CONCLUSION
 
 59
 The decision of the district court is reversed. The N.L.R.B. is ordered to disclose to the plaintiff the Form 4069, but is to withhold from disclosure the union authorization cards.
 
 
 60
 SKELTON, Senior Judge, concurring in part and dissenting in part:
 
 
 61
 I concur with the holding of the majority that Form 4069 is purely factual in nature and is not exempt from disclosure under any of the exemptions of the Freedom of Information Act (The Act).
 
 
 62
 I respectfully dissent as to the holding of the majority that the union authorization cards are exempt from disclosure under Exemption 6 of the Act. Exemption 6 provides that the following information in a Government Agency file is exempt from disclosure to the public:
 
 
 63
 "(6) Personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."
 
 
 64
 In my opinion, the determination of what is exempt from disclosure under this Section of the Act requires a two-step process as follows: First, we must decide whether or not the requested information is a personnel, medical or similar file. If the information is neither a personnel, medical nor similar file, that is the end of the matter and the information must be disclosed. In making this determination, if the information involves a written instrument, we apply the usual rules of law in construing the instrument. If questions of fact are involved, we decide the matter in accordance with the substantial evidence rule as defined by the Supreme Court in Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126, 140 (1938). Even if it is decided that the requested information is a personnel, medical or similar file, the material without more is not automatically exempt from disclosure. Robles v. E. P. A., 4 Cir., 484 F.2d 843, 846 (1973). The Supreme Court held in Dept. of Air Force v. Rose, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976):
 
 
 65
 "- - - We find nothing in the wording of Exemption 6 or its legislative history to support the Agency's claim that Congress created a blanket exemption for personnel files. Judicial interpretation has uniformly reflected the view that no reason would exist for nondisclosure in the absence of a showing of a clearly unwarranted invasion of privacy whether the documents are filed in 'personnel' or 'similar' files. See, e. g., Wine Hobby USA, Inc. v. IRS, 502 F.2d 133, 135 (CA3 1974); Rural Housing Alliance v. United States Dept. of Agriculture, 162 U.S.App.D.C. 122, 126, 498 F.2d 73, 77 (1974); Vaughn v. Rosen, 157 U.S.App.D.C. 340, 484 F.2d 820 (1973); Getman v. NLRB, 146 U.S.App.D.C. 209, 213, 450 F.2d 670, 674 (1971). Congressional concern for the protection of the kind of confidential personal data usually included in a personnel file is abundantly clear. But Congress also made clear that nonconfidential matter was not to be insulated from disclosure merely because it was stored by the Agency in 'personnel' files." 425 U.S. 371, 96 S.Ct. 1604, 48 L.Ed. 27. (Emphasis supplied)
 
 
 66
 Accordingly, if it is determined that requested information is a personnel, medical or similar file, and only then, we must proceed to the second step, which is a determination of whether or not a disclosure of the information would "constitute a clearly unwarranted invasion of personal privacy." If so, the material is exempt, and, if not, it is not exempt and must be disclosed.
 
 
 67
 Although not saying so in so many words, the courts have been fairly uniform in following this two-prong determination of what should or should not be disclosed under Exemption 6. This procedure was followed in Department of the Air Force v. Rose, supra; in Robles v. E. P. A., 484 F.2d 843, 4th Cir., (1973); in Rural Housing Alliance v. U. S. Department of Agriculture, 162 U.S.App.D.C. 122, 126, 498 F.2d 73, 77 (1974); in Getman v. N. L. R. B., 146 U.S.App.D.C. 209, 213, 450 F.2d 670, 674 (1971); and in Committee on Masonic Homes, etc., v. N. L. R. B., 556 F.2d 214, 3rd Cir., (1977).
 
 
 68
 Following this procedure and these guidelines in the instant case, we must determine under the first step whether or not the union cards are personnel, medical or similar files. They are clearly not medical files or similar to medical files, and this is conceded by the majority. In my opinion, the cards are not personnel files, as they do not contain information normally included in personnel files. The Supreme Court pointed out in Department of Air Force v. Rose, supra, that the requested records in that case were not personnel files, saying:
 
 
 69
 "Moreover, even if we were to agree that 'personnel files' are wholly exempt from any disclosure under Exemption 6, it is clear that the case summaries sought here lack the attributes of 'personnel files' as commonly understood."
 
 
 70
 "- - - (T)he - - - records do not contain the 'vast amounts of personal data,' S.Rep. No. 813, p. 9, which constitute the kind of profile of an individual ordinarily to be found in his personnel file: showing, for example, where he was born, the names of his parents, where he had lived from time to time, his high school or other school record, results of examinations, evaluations of his work performance." 425 U.S. 377, 96 S.Ct. 1606, 48 L.Ed.2d 30.
 
 
 71
 The union cards do not contain the historical life or work records of the workmen involved that are ordinarily found in personnel files. Accordingly, they are not personnel files. The majority agrees that this is true. I emphasize the point only because it is important to the consideration below of "similar" files.
 
 
 72
 Having determined that the union cards are not medical files nor similar to medical files and are not personnel files, the only question left for consideration under step one is whether or not the cards are files that are "similar" to personnel files. The majority holds that they are. In my opinion they fall into error in doing so for the reasons that follow.
 
 
 73
 In the first place, an examination of the cards shows that they are instruments that are the property of the Union and not of the plaintiff company. At the top of the cards appear the words "authorization and application for membership" in the Union. The cards are that and nothing more. They contain none of the characteristics or profiles usually and ordinarily found in personnel files such as where the signers were born, their ages, the names of their parents, where they have lived and worked from time to time, their school records and training, results of examinations, evaluations of work performance, attendance records, attitudes and aptitudes, tardiness and absence records, health conditions, length of employment, and many other items usually found in personnel records. As shown by the above, personnel records are historical in nature and contain information relative to a workman's life history and his work history. They encompass data on him and about him and his life and work in the past. None of this information was contained in the union cards.
 
 
 74
 Furthermore, the cards were prospective in nature and were prepared by the workmen with reference to future events that had nothing to do with their past work records or their personnel records kept by the company. The cards merely expressed the personal views and wishes of the workmen on actions to be taken in the future. Neither the workmen nor the Union has objected to their disclosure.
 
 
 75
 The information on the cards such as the names and addresses of the workmen and their employer, their department, shift and classification, is nothing more than data for the Union that is usually found in a directory, and has nothing to do with their life and work history. It should be pointed out that the company has all of this information in its possession and it is not the information it is requesting. All that the company is requesting is the signatures of the workmen on the cards and the dates they signed them. If it could be assumed arguendo that all of the information on the cards except the signatures and dates is similar to personnel files and exempt from disclosure, it could be excised in accordance with the Amendment to the Act, and the signatures and dates could be disclosed.[1] This was the procedure followed by the Supreme Court in Dept. of the Air Force v. Rose, supra, and also by the court in Rural Housing Alliance v. U. S. Dept. of Agriculture, supra. If all of the information on the cards except the signatures and dates is excised, all that would be left would be the signatures and the dates. In that event, it could hardly be said that the bare signatures and dates are "similar" to personnel files within the meaning of the Act, or even as a matter of fact.[2] In Getman v. N. L. R. B., supra, the court ordered disclosure of names and addresses of employees eligible to vote in a representation election. In Robles v. E. P. A., supra, names and addresses of persons were ordered disclosed by the court.
 
 
 76
 I would hold that the union cards are not "similar" to personnel files. Therefore, since the cards are not personnel, medical or similar files, they are not exempt under exemption (6) of the Act and must be disclosed. Under these circumstances, it is not necessary, nor is there authority under the Act, for us to proceed to the second step and determine whether or not a disclosure of the requested information would "constitute a clearly unwarranted invasion of personal privacy." Yet the majority has done so and in so doing has fallen into error. The majority has been misled, in my opinion, by two decisions of the Third Circuit Court of Appeals, namely, Wine Hobby USA, Inc. v. I. R. S., supra, and Committee on Masonic Homes, etc. v. N. L. R. B., supra, which, with deference to that learned court, I believe were wrongly decided. In the Wine Hobby case the court used step two to establish step one when it held that the names and addresses of the persons who had obtained permits to make wine for personal use at home was a file "similar" to personnel and medical files, because "the disclosure of which may constitute a clearly unwarranted invasion of personal privacy." This put the "cart before the horse", so to speak. The court should have first determined from the facts whether or not the names and addresses were similar to medical and personnel files, and, if so, then determined whether or not their disclosure would be a clearly unwarranted invasion of personal privacy. The holding of the court that the names and addresses of the permittees were similar to medical files shows how wrong the decision was, as the names and addresses had no medical connection or information whatever.
 
 
 77
 In the Committee on Masonic Homes case, which is a case involving the same or similar union cards as those here, the same court recognized that "exempt files must in some way be 'similar' to personnel and medical files" and then held that the cards contained, in effect, a thumbnail sketch of the employees' job classification and status, in addition to the union authorization, and, therefore, were "similar" files. This holding was clearly erroneous, as it is abundantly clear, that the mere "thumbnail sketch", if it could be thus classified, was wholly insufficient to show what is usually and ordinarily found in a personnel file. Consequently, the so-called thumbnail sketch was not enough to make the cards similar to either medical or personnel files. This was especially true as to their total lack of similarity to medical files. Calling the cards similar does not alone make them similar. The facts control. If a cow is called a horse, that does not make it one.
 
 
 78
 The Freedom of Information Act is recognized by the majority to have been "broadly conceived as it sought to 'permit access to official information long shielded unnecessarily from public view . . .' Environmental Protection Agency v. Mink, 410 U.S. 73, 80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973)" (emphasis supplied). In providing for Exemptions the Senate Committee pointed out that "(s)uccess lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure " (emphasis supplied). S.Rep. No. 813, p. 3.
 
 In the Getman case the court stated:
 
 79
 "Exemption (6) requires a court reviewing the matter de novo to balance the right of privacy of affected individuals against the right of the public to be informed; and the statutory language 'clearly unwarranted' instructs the court to tilt the balance in favor of disclosure." 146 U.S.App.D.C. 213, 450 F.2d 674. (Emphasis supplied.)
 
 
 80
 This statement was approved by the same court in the Rural Housing Alliance case (162 U.S.App.D.C. 122, 126, 498 F.2d 73, 77).
 
 
 81
 The clause "a clearly unwarranted invasion of personal privacy" in the Act is obviously one of limitation and not one of expansion. The legislative history of the Act shows this to be true. In Getman v. N. L. R. B., supra, the court pointed out:
 
 
 82
 "S.Rep. at 9; H.Rep. at 1. The legislative history suggests that use of the 'clearly unwarranted' standard is the expression of a carefully considered congressional policy favoring disclosure. At the hearings on the bill various agency spokesmen urged deletion of either the word 'clearly' or the entire 'clearly unwarranted' phrase so that nondisclosure would have been permitted whenever disclosure would result in any invasion of privacy." (Including a spokesman for N.L.R.B.)
 
 
 83
 "Congress, however, refused to delete language it considered critical in limiting the scope of the exemption. See S.Rep. at 9; H.Rep. at 11." 146 U.S.App.D.C. 213, 450 F.2d 674, n.11. (Emphasis supplied)
 
 
 84
 The Senate Report dealing with Exemption 6 states, "It is believed that the scope of the exemption is held within bounds by the use of the limitation of 'a clearly unwarranted invasion of personal privacy.' The phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests . . ." S.Rep. No. 813, p. 9. The House Report dealing with this Exemption contains very similar language, to wit, "The limitation of a 'clearly unwarranted invasion of personal privacy' provides a proper balance . . . ." H.R.Rep. No. 1497, 89th Cong., 2d Sess., 11 (1966), U.S.Code Cong. & Admin.News 1966, p. 2428. (Emphasis supplied).
 
 
 85
 It is clear that Congress intended this clause to be one of limitation or restriction and not one of expansion in the interpretation and application of Exemption 6. The foregoing legislative history of the Act indicates that non-disclosure of requested information will be permitted only after it has been determined that it is a personnel, medical, or similar file, and, if so, only if the disclosure would constitute a clearly unwarranted invasion of personal privacy (i. e. the two-step determination). As shown above, the opponents of the Act (including N.L.R.B.) urged deletion by Congress of the word "clearly" and of the entire phrase "clearly unwarranted" so that non-disclosure would be permitted whenever disclosure would result in any invasions of privacy. The Congress refused to delete this language.
 
 
 86
 It appears to me that in the instant case the majority is doing exactly what the Congress expressly refused to do, in that they first hold that the union cards are personal to the workmen and that disclosure would invade their privacy and, therefore, the cards are similar to personnel files and should not be disclosed. This result has been reached by reverse reasoning and, in my opinion, contrary to the expressed intent and purpose of Congress. Under this holding any invasion of personal privacy would result in non-disclosure regardless of whether the material was a personnel, medical or similar file.
 
 
 87
 In enacting the Freedom of Information Act Congress intended that the exemptions contained therein be construed and interpreted very broadly so as to allow the fullest possible disclosure of government records. Many courts have so construed the Act. Yet the majority in the instant case have construed the Act very narrowly by holding, in effect, that any material that is personal or private should not be disclosed. This results in a denial of disclosure contrary to the intent of Congress and the interpretation of the Act by many Courts. The test under Exemption 6 should not be whether the material is personal or private, but whether or not it is a personnel, medical or similar file, and, if not, as in the case before us, it must be disclosed.
 
 
 88
 I would affirm the judgment of the District Court requiring the disclosure of Form 4069, and reverse that part of the judgment permitting non-disclosure of the union cards, and would order the union cards disclosed.[3]
 
 
 
 *
 Senior Judge of the United States Court of Claims, sitting by designation
 
 
 [1]
 Under the Board's Statements of Procedure, a union petitioning for an election must submit evidence, normally in the form of signed authorization cards or petitions, indicating that at least thirty percent of the employees in the requested bargaining unit have designated the union as their representative. Otherwise, the petition will be dismissed because the Board's administrative experience is that in the absence of special factors the conduct of an election serves no purpose under the statute unless the petitioner has been designated by at least thirty percent of the employees
 The authorization card reads:
 
 
 [2]
 The effect of the decision in Linden Lumber v. N.L.R.B., 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974) is evidenced by the facts of this case. The union had received authorization cards from more than 50% of the people in the bargaining unit. Instead of offering these cards to the company for inspection, the union instead offered to make the cards available for verification to "any responsible disinterested person such as a Minister or Rabbi or a member of the Federal Mediation and Conciliation Service. . . ." App. 246a
 
 
 [3]
 The Senate Report reads:
 Exemption No. 6 contains an exemption for "personnel and medical files, and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Such agencies as the Veterans' Administration, Department of Health, Education, and Welfare, Selective Service, etc., have great quantities of files, the confidentiality of which has been maintained by agency rule but without statutory authority. There is a consensus that these files should not be opened to the public, and the committee decided upon a general exemption rather than a number of specific statutory authorizations for various agencies. It is believed that the scope of the exemption is held within bounds by the use of the limitation of "a clearly unwarranted invasion of personal privacy."
 The phrase "clearly unwarranted invasion of personal privacy" enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information. The application of this policy should lend itself particularly to those Government agencies where persons are required to submit vast amounts of personal data usually for limited purposes. For example, health, welfare, and selective service records are highly personal to the person involved, yet facts concerning the award of a pension or benefit should be disclosed to the public.
 S.Rep. No. 813, p. 9.
 
 
 [4]
 The House Report reads:
 Personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy: Such agencies as the Veterans' Administration, Department of Health, Education and Welfare, Selective Service, and Bureau of Prisons have great quantities of files containing intimate details about millions of citizens. Confidentiality of these records has been maintained by agency regulation but without statutory authority. A general exemption for the category of information is much more practical than separate statutes protecting each type of personal record. The limitation of a "clearly unwarranted invasion of personal privacy" provides a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information by excluding those kinds of files the disclosure of which might harm the individual. The exemption is also intended to cover detailed Government records on an individual which can be identified as applying to that individual and not the facts concerning the award of a pension or benefit or the compilation of unidentified statistical information from personal records.
 H.R.Rep. No. 1497, 89th Cong., 2d Sess., 11 (1966), U.S.Code Cong. & Admin.News, 1966, pp. 2418, 2428.
 
 
 [5]
 See also Robles v. Environmental Protection Agency, 484 F.2d 843 (4th Cir. 1973), wherein the plaintiffs sought the names and addresses of owners of buildings whose radiation levels exceeded the Surgeon General's safety guidelines. As to the meaning of "similar files," the Court explained:
 The term "similar" was used, it seems, to indicate that, while the exception was not limited to strictly medical or personnel files, the files covered in this third category must have the same characteristics of confidentiality that ordinarily attach to information in medical or personnel files; that is to such extent as they contain " 'intimate details' of a highly personal nature," they are within the umbrella of the exemption.
 Id. at 845. We realize that the Robles test of "intimate details of a highly personal nature" is somewhat more restrictive than the inquiries made in Wine Hobby or Rose. We feel, however, that the manner in which you classify personal information should not be the crucial factor in deciding whether Exemption 6 applies, but rather the emphasis should be placed on whether disclosure of the information would result in a clearly unwarranted invasion of personal privacy.
 
 
 [6]
 In holding that employees have a right to privacy with regard to their union beliefs, we reject outright the plaintiff's argument that the employees have no expectation of privacy since they are aware that it is possible that the union on its own accord might show the cards to the employer. We reject this argument because in real life circumstances the union would only show the cards to the employer in an effort to gain voluntary recognition of the union, and only after the union had received signatures from over fifty percent of the affected employees. In this case, the likelihood of retaliation against any single card signer by either the company or other unit employees would be substantially diminished because of the increased number of union supporters, and because of the enhanced authority of the union to speak on behalf of all the employees. Thus, in this situation, an employee is giving up his right to privacy regarding his union sentiments only in an effort to effectuate those sentiments. We hardly feel that one could say that an employee has no privacy interest regarding his union sentiments simply because he is willing to make public those thoughts once he is assured of the protection provided by the fact that a majority of his co-workers have views similar to his own
 
 
 [7]
 For example, the plaintiffs in this case allege that there are certain employees in the proposed bargaining unit who neither speak, read, nor write English. The plaintiffs contend that if their signatures are on any of the cards then they must have been obtained fraudulently. What the plaintiffs fail to point out is that the N.L.R.B. has a procedure to check out such potential fraud if they are notified of it. The plaintiff was evidentially not overly concerned with the potential fraud since it never bothered to ask the N.L.R.B. to check the cards in order to see if any of the non-English speaking employees had signed them
 
 
 [8]
 As we explained earlier, the only information contained in the form is the number of employees in the prospective unit, the number of signed authorization cards, and the percentage of people in the unit who signed cards. There are no names or addresses in the form which would in any way compromise the privacy right of the employees, and nowhere in the form is there any information the disclosure of which might arguably hamper the full and frank exchange of information within the agency
 
 
 [9]
 The Robbins Tire opinion delved deeply into the legislative history of Exemption 7(A). The Court pointed out that Exemption 7 was originally enacted in 1966 and its foremost purpose was " 'to prevent harm (to) the Government's case in court.' " --- U.S. ----, ----, 98 S.Ct. 2311, 2319, 57 L.Ed.2d 159 (1978). In 1974 the exemption was rewritten to its present form. The motivating force behind the amendment was the congressional concern that the exemption not be used to endlessly protect material simply because it was in an investigatory file. The Court distinguished the case before it with other cases by explaining:
 Here, by contrast, an imminent adjudicatory proceeding is involved, in which the special dangers of interference with enforcement proceedings from prehearing disclosure are necessarily of a finite duration.
 Id. at ---- n.10, 98 S.Ct. at 2320 (emphasis supplied). The Court further explained that the release of information in investigatory files prior to the completion of an "actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against." Id. at ----, 98 S.Ct. at 2322. In our case, however, there is no investigation underway, nor is there any contemplated labor enforcement proceeding. Thus, prohibiting the disclosure of this information would not serve the purpose behind the exemption.
 
 
 [1]
 See 5 U.S.C. § 552(b) (1970 ed. Supp. V), 5 U.S.C.S. § 552(b)
 
 
 [2]
 Contra. Committee on Masonic Homes, etc. v. N. L. R. B., supra. This case is discussed below
 
 
 [3]
 As a matter of fact, in the present posture of this case, there is little reason for it to be before this court. The questions involved are for all practical purposes moot. The union election has been held and the company won. Consequently, there is no logical reason why the company should maintain this suit to compel disclosure of the union cards, and no logical reason for N.L.R.B. to maintain its cross-appeal from the judgment requiring it to disclose Form 4069. However, the parties are determined to continue the controversy, which appears to be much ado about nothing as far as this case is concerned